ROBERT H. ORCHARD and LOIS N. ORCHARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Orchard v. Commissioner
Docket No. 7290-72
United States Tax Court
T.C. Memo 1975-31; 1975 Tax Ct. Memo LEXIS 341; 34 T.C.M. (CCH) 205; T.C.M. (RIA) 750031; February 24, 1975, Filed Harold G. Blatt and Juan D. Keller, for the petitioners. James E. Cannon, for the respondent. WILBUR
MEMORANDUM OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years 1969 and 1970 in the amounts of $14,842.00 and $26,304.13, respectively. Due to concessions made by the parties, the only issues remaining for decision are: (1) Whether the magnetic tape copies of opera recordings donated to various universities were contributions of property alone, or were contributions of property and services; (2) If the donated tapes are contributions of property, what is the fair market value of the tapes; (3) If the tapes reproduced are contributions of property, whether *343 the deduction for tapes donated in 1970 must be reduced by the amount which would not have been a longterm capital gain if the contributed property had been sold by the petitioners. All of the facts have been stipulated and are incorporated herein by this reference along with accompanying exhibits. Petitioners Robert H. and Lois N. Orchard, husband and wife, were residents of St. Louis, Missouri, at the time they filed their petition in this case. [1]
Petitioner has been an avid devotee of opera for many years and has amassed a sizable collection of operatic recordings from various sources. Petitioner's collection consists of both commercially recorded opera performances and copies of opera records on magnetic tape which have not been commercially recorded. Many of the copies of opera recordings in petitioner's collection are copies of operas privately recorded from radio broadcasts of concert performances by European stations. Access to these "boot-leg" tapes, as well as out-of-print recordings in *344 petitioner's collection, was limited, and in some cases petitioner was virtually the only source from which they could be acquired. Since 1962, petitioner has purchased magnetic tape recordings of operas primarily from two retail dealers in New York City, Classical Records Shop and Music Masters. Petitioner has no records from which to determine the exact purchase price of each opera purchased from Classical Records Shop. Petitioner has paid from $17.50 to $35 for complete opera recordings purchased from Classical Records Shop and paid $52.50 for at least two operas. Petitioner paid $35 per opera for the majority of operas purchased from Classical Records Shop. Petitioner does not have any interest in Classical Records Shop. Music Masters charged petitioner $25 per opera (each opera consisting of one magnetic tape), and this is the price Music Masters charged all its customers, including universities, who purchased opera recordings. Petitioner paid ten cents per record for twenty operas purchased in Russia several years before 1966. One of petitioner's New York sources (apparently either Classical Records or Music Masters) produces boot-leg tape recordings under the label Golden *345 Age. A few hundred of each title of these privately-made recordings are put out. Beginning in 1963, petitioner started reproducing copies of his opera tape recordings and began giving those reproduced copies to Washington University, St. Louis, Missouri. During 1966, petitioner also began to send copies of his opera tape recordings to Harvard University, Cambridge, Massachusetts, and Lindenwood College, St. Charles, Missouri. Petitioner continued sending copies of his opera tapes to these universities during 1967, 1968, 1969 and to all but Lindenwood College in 1970. During these years contributions of a few copies of his opera tapes were also made to Indiana University and the University of North Dakota. Petitioner's practice was to send the donee institution a list of operatic recordings in his collection. The donee institution would compare the list against their own collection, and check the items on the list that they desired copies of. Subsequent to providing the desired copies from his current holding, petitioner would sometimes supply supplementary lists of additional acquisitions, and make copies of the additional acquisitions desired by the donee institutions, and would *346 on other occasions simply record the new acquisitions which he had reason to believe the donee desired but did not have. While a small number of commercially available tapes may have been donated, the donees' interest in petitioner's collection focused on boot-leg recordings and out-of-print recordings, and copies of these recordings comprise nearly all of the contributed tapes. By April 19, 1966, petitioner had sent Washington University a copy of all the recordings they desired from his collection as it existed at that time; by May 21, 1968, petitioner had sent to Harvard University a copy of all the recordings they desired from his collection as it existed at that time. During 1967, 1968, 1969, and 1970 petitioner contributed a total of 865 tapes to Washington University. During 1969 and 1970, petitioner contributed a total of 750 tapes to Harvard University. The remaining contributions during the years 1965 through 1970 totaled 2233 tapes. Thus, a total of 3848 tapes were contributed during the years 1965 through 1970, for which petitioner claimed charitable deductions aggregating $119,270.00. The quality of the initial copies purchased by petitioner and those he reproduced *347 from these copies for the various donees was substantially the same. The copies of opera tapes purchased or reproduced by the petitioner were not subject to the copyright laws, and there were no restrictions on the reproduction of the music itself. Petitioner donated the taped copies he made of his original acquisitions and he was the owner of the tapes he donated. He did not donate artistic property which he created. Each of the donee institutions is an organization organized and operated exclusively for educational purposes, and the recordings were donated to them exclusively for such purposes and have been used for such purposes. The donees and gifts satisfy the requirements of section 170 (c) (2) (B). [2]
Petitioner personally made the donated copies from his original tapes on machines at his home and in his office. Petitioner's purchased recordings were normally accompanied by an index card listing the opera's composer and cast, if available. Petitioner, when reproducing his recordings for the donees, would first make an announcement on the *348 copy stating the title of the work, the composer, the cast if available, the language in which the opera was sung, and any other pertinent information. The completed copies were then shipped in crates to the donee institutions. It has been stipulated that 77 of the 578 copies donated in 1970 were sent to donee institutions more than 6 months after he purchased his initial copies, and 254 were donated less than 6 months after he purchased his initial copy. With respect to the remaining 247 copies sent to the donees in 1970, petitioner's records do not establish when the initial copies were purchased. However, during all of the years in question the copies made by petitioner from his purchased recordings were not held for six months before sending the copy to the donee institutions. During the years 1965 through 1970, petitioner purchased all the reels of tape upon which copies were made, with the exception of 325 reels of tape purchased by the Orchard Corporation of America in 1970. During 1970, petitioner used substantially all of the reels of tape purchased by Orchard Corporation to make copies for donee institutions. Petitioner is the president, chief executive officer and majority *349 stockholder in Orchard Corporation of America. On petitioner's returns for 1965 through 1968, he took a charitable contribution deduction of $35 per donated opera; on his returns for 1969 and 1970, he took a charitable deduction of $25 per donated opera. Section 170(a) allows a deduction for charitable contributions to organizations defined in section 170 (c) (2) (B). The parties have stipulated that the donees were organizations described in section 170 (c) (2) (B) and that the contributions in question were given and used for educational purposes. The dispute involved concerns whether the contributions were gifts of property and services or property alone; the value to be assigned to any gifts of property that may have been made; and whether or not the value of gifts made during 1970 must be reduced in accordance with provisions added to the Code by the Tax Reform Act of 1969. [3]
Respondent attempts to characterize petitioner's gifts as gifts of property and services, [4] deductible only to the extent of the value of petitioner's out-of-pocket expenditures for the blank reels of magnetic tape used in reproducing the originally purchased *350 recordings. [5]
Respondent contends that there was an agreement between petitioner and the donee institutions for his services in reproducing copies of his recordings, and that this agreement renders the services separable from any property donated. Respondent's reply brief concedes that if there was no agreement, the services coalesce with the blank tape into the finished tape, making petitioner's gifts one of property and not of service. See Bernard Goss,59 T.C. 594 (1973); John R. Holmes, 57 T.C. 430 (1971). *351 Since we accept respondent's concession, we must determine whether or not there was an agreement for services. There is no basis in the record for respondent's contention. During discussions with the various donees, the petitioner's clearly manifested intention, which corresponded with the understanding of the donees, was to donate copies of his own recordings reproduced by the petitioner himself. Petitioner in fact donated tapes and retained control and ownership of the tapes until the gift was made. Both the petitioner and the donee regarded the transactions as gifts of tapes. Respondent, apparently recognizing that the elements of a contract are absent in these transactions, avoids using the term contract and continually refers to an "agreement." In reality, respondent is simply referring to the understanding of the parties concerning the procedures by which the gift of the reproduced tapes would be consummated. As indicated, this understanding contemplated that gifts of the reproduced tapes would be made and gifts of tape in fact were made. We therefore hold that petitioner made gifts of property. Goss,supra;Holmes,supra. *352 Admittedly, petitioner has, through a process akin to mitosis, managed to retain his original collection intact while at the same time completing substantial gifts whose value derives mainly from his original collection. But petitioner nevertheless donated tapes and respondent has stipulated that they were substantially identical in quality to those in petitioner's original collection. As will be subsequently discussed, Congress dealt with the alchemy in this situation in the Tax Reform Act of 1969, and specifically applied the correction on a prospective basis. Respondent contends that even if petitioner's contributions were of property rather than services, his determination must be sustained because petitioner has failed to establish a fair market value for the tapes on the date of the contribution in excess of his cost for the blank tapes. The regulations provide that the amount of a charitable contribution in property other than money is the fair market value of the property on the date contributed. Income Tax Regs. Sec. 1.170A-1(c)(1). Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being *353 under any compulsion to buy and sell and both having reasonable knowledge of the relevant facts. Income Tax Regs. Sec. 1.170A-1 (c) (2). Although reasonably contemporaneous sales of the same or similar property are generally the most relevant criteria, the fair market value of property on a given date is a question of fact, to be resolved from a consideration and weighing of all the relevant evidence presented. Bernard Goss,59 T.C. 594, 596 (1973). The parties have stipulated that the quality of the initial copies purchased by petitioner and the reproduced copy he donated was "substantially the same." Petitioner's general practice was to send the donees the reproduced copy as soon as it was made, and the parties have stipulated that the reproduced copies were always sent within six months of the time the copy was made. We believe that this requires a conclusion that the value of petitioner's initial copy and the donated copy was substantially the same on the date of the contribution.
We must therefore determine the value of the initial recording on the date petitioner contributed a copy thereof to the various donees. Petitioner paid from $17.50 to $35 for *354 each tape purchased from Classical Records, with the majority of the tapes costing $35. He paid Music Masters $25 per tape, the price Music Masters charged all of their customers. We believe the prices paid to Classical Records and Music Masters represent the fair market value of the tapes purchased from these sources as of the date of acquisition.
We have found that petitioner completed transmitting desired copies of his collection as it then existed to Washington University in 1966 and to Harvard University in 1968. The record makes it clear that tapes sent to those universities subsequent to these years were of new acquisitions obtained primarily from Classical Records and Music Masters, and that the copies were made and donated at a time reasonably close to the date petitioner acquired the initial copy. We therefore believe that the price paid Classical Records and Music Masters is strong evidence of the fair market value of the tapes contributed to Washington University after 1966 and those contributed to Harvard after 1968. Despite this strong evidence, uncertainties remain even as to these contributions. Some of the contributed tapes during these years may have been *355 copies of recordings acquired from sources other than Classical Records and Music Masters. Even where other sources may not be involved, the proportion of the donated tapes made from recordings acquired from Classical Records and the precise acquisition cost of the tape from Classical Records (although within a range of $17.50 to $35 per tape) is not known. Recognizing that petitioner has the burden of proof and considering these factors together with all of the evidence presented (including the existence of other copies not subject to copyright restrictions), we find that the fair market value of the 865 tapes contributed to Washington University during 1967, 1968, 1969 and 1970, and the 750 tapes contributed to Harvard during 1969 and 1970 was $22 per tape. The remaining 2233 tapes contributed by petitioner present substantial difficulties. Petitioner apparently had a sizable collection of tapes prior to 1962, when he began acquiring his tapes "primarily" from Classical Records and Music Masters. Additionally, he apparently acquired tapes after 1961 from other sources. We do not know what percentage of the remaining tapes contributed were copies of pre-1962 acquisitions or post-1961 *356 acquisitions from sources other than Music Masters and Classical Records. Even if we knew what portion of these tapes were copies of acquisitions from Classical Records and Music Masters, we are unable to determine which of these two suppliers was the source of the recording from which the donated tape was made. As to Classical Record tapes, we are unable to determine whether the donated tape was made from an initial copy costing $17.50, $35, or some figure in between. Additionally, with regard to the remaining tapes, there may have been a considerable lag between the time when the initial recording was acquired and the copy made and transmitted to the donee, thus diminishing the relevance of the acquisition costs in determining the value of the donated copy (particularly since other copies were circulating without any restrictions on reproduction). In view of these difficulties, the price paid to Classical Records and Music Masters is of marginal relevance in determining the value of the remaining tapes. As to these remaining tapes, petitioner has failed to identify specifically the tapes contributed, the source of acquisition, the date acquired, or the cost of acquisition (other *357 than his acquisition costs from Classical Records and Music Masters). Petitioner has produced little evidence as to the value of his initial copies on the date the remaining copies were contributed to the various donees. Since petitioner has the burden of proof, the uncertainties attending valuation of the remaining tapes, an admittedly unscientific process under the circumstances presented, must be resolved against petitioner. However, recording an opera on the blank tape obviously increased the value of the blank tape significantly above its acquisition costs, since the copy was of substantially the same quality as the initial tape. Additionally, these tapes (aside from the incidental contribution of commercially recorded tapes that may have occurred) were described as scarce, not commercially produced, or not otherwise available. They were often out of print, or recorded privately in small numbers given limited distribution. They obviously had value on the date the copies were contributed to the universities in excess of tapes commonly available on the commercial market, and the copies, being of substantially the same quality, were of comparable value. Finally, some of these tapes *358 were undoubtedly copies made from tapes acquired from Music Masters and Classical Records during the years in question, and some of them were probably copied and donated close to the time the initial tape was acquired. Considering these facts along with all of the other relevant evidence in the record, and mindful that petitioner has the burden of proof, we find that the value of the remaining copies on the date of contribution was $12 per tape. The final issue concerns the applicability of section 170 (e) (1) (A) to the property contributed during 1970. Section 170 (e) (1) (A) provides that the amount of any charitable contribution of property shall (for periods after December 31, 1969) be reduced by the amount of gain which would not have been long-term capital gain if the contributed property had been sold at its fair market value at the time of the contribution. [6] Section 1222(3) defines the term "long-term capital gain" as gain from the sale or exchange of a capital asset held for more than six months. [7]
*359 Petitioner argues that he took property which he owned and incorporated such property into other property he owned citing Waterman Steamship Corp., v. United States,203 F.Supp. 915 (S.D. Ala. 1962); Williams v. Commissioner,285 F.2d 582 (C.A. 5 1961); and Commissioner v. Williams,256 F.2d, 152 (C.A. 5, 1958). He argues that his holding period, under these circumstances, for the reproduced tapes he donated relates back to the date of purchase of his initial recordings. Since it is stipulated that 77 of the tapes donated in 1970 were made from initial copies held for more than six months before copies were sent to the donees, petitioner argues that sales of these 77 tapes would have produced long-term capital gain. As to the remaining tapes donated in 1970, petitioner appears to argue that since the initial recordings and reproduced copies were substantially the same, and there is no evidence to indicate whether the originals or copies were donated, he should be permitted to use a first-in-first-out method of accounting for his gifts. The net effect of this would be to assume that the initial recordings, acquired before *360 the reproduced copies were made, were given to the donees with the petitioner retaining the copy. The short answer to both these arguments is that petitioner in fact donated the reproduced copies, which were distinct and separate property from his own collection which he retained completely intact. The reproduced copies were on separate blank tapes that could be distinguished from petitioner's initial copies. Additionally, the reproduced copy contained a brief announcement by the petitioner relative to pertinent information about the opera. When the donees received a poorly recorded copy they returned it to petitioner to redo. It is also clear from the correspondence attached as exhibits to the stipulation that petitioner in fact donated the reproduced copies. It is true that in the stipulation petitioner reserved the right to establish "at the time of trial that some of the copies contributed were original copies purchased by petitioner." However, petitioner had the burden of proof and no evidence was ever introduced to establish this assertion. Petitioner donated his reproduced copies, and the parties have stipulated that the reproduced copies themselves were not held for more *361 than six months before being sent to the donees. Therefore, a sale on the contribution date for the fair market value of the property would not have produced long-term capital gain, and section 170(e) (1) (A) is applicable to the tapes donated in 1970. Finally, petitioner makes the argument that, since respondent failed to adequately brief the section 170 (e) (1) (A) issue, he must be deemed to have conceded the issue under Tax Court Rule 151 (e) (4). However, petitioner was apprised of the issue in the deficiency notice, and discussed the issue in his original brief. It is true that he was unable to reply to respondent's argument on this issue as these arguments appear only in respondent's reply brief. However, in view of the stipulation, the law is clear and under the circumstances of this case we do not feel petitioner was unfairly prejudiced. In order to reflect concessions made by the parties, Decision will be entered under Rule 155.
Footnotes
1. Since Lois N. Orchard is a party to this proceeding only by virtue of having filed a joint return with her husband, Robert H. Orchard will be referred to as the petitioner.↩
2. All references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated.↩
3. Public Law 91-172, December 30, 1969.↩
4. Income Tax Regs. Sec. 1.170A-1(g) (for contributions after January 1, 1970) and Income Tax Regs. sec. 1.170-2(a) (2) (for contributions prior to January 1, 1970) provide that: No deduction is allowable [under section 170] for [a] contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. * * * [Brackets denote additional wording contained in Regs. sec. 1.170A-1(g)↩] 5. The parties have stipulated that the expenditures for the purchase and repair of recording equipment are not deductible.↩
6. Section 170 (e) (1) (A) reads: SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (e) Certain Contributions of Ordinary Income and Capital Gain Property.-- (1) General Rule.--The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of-- (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution) * * *. ↩
7. Section 1222(3) reads: SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES. (3) Long-term capital gain.--The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.↩