## KEYSTONE WOOD PRODUCTS CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 166.

Circuit Court of Appeals, Second Circuit.

July 10, 1933.

John E. Hughes, of Chicago, Ill., and William Cogger, of Washington, D. C., for petitioner.

Sewall Key and John MacC. Hudson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Dean P. Kimball, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The petitioner was incorporated in 1912 to engage in the manufacture of wood chemicals. Its capital stock was $250,000, and this sum was paid in in cash. In September, 1912, it acquired by assignment and without cost a contract for the purchase of wood suitable for the making of wood chemicals. Deliveries were made under this contract for a term of ten years beginning in October, 1912. The petitioner contends that its contract for wood, when acquired and on March 1, 1913, had a fair market value of at least $800,000, and it claims (1) the right to deduct from gross income for the taxable years in suit a reasonable allowance for the exhaustion of its wood supply contract, pursuant to section 234 (a) (7) of the Revenue Act of 1918 (40 Stat. 1078); and (2) the right to include in its invested capital the value of said contract, pursuant to section 326 (40 Stat. 1092). The Board of Tax Ap-

peals denied both claims, holding that the contract was not proved to have had value when acquired or on March 1, 1913. This finding of fact the petitioner challenges as wholly unsupported by the evidence.

By the contract in question, Norwich Lumber Company, the owner of rights in a tract of hardwood timber, agreed to deliver to Lackawanna Chemical Company at a factory to be built by it near Norwich, Pa., at least 30,000 cords of chemical wood per year at the price of $4.45 per cord, payable on the 15th day of the month following delivery. The contract provided that the rights and obligations of the Lackawanna Company should be assigned to and assumed by a corporation to be formed with a capital of not less than $250,000 paid in in cash. Pursuant to this provision, it was assigned to the petitioner, who paid nothing for it. The petitioner built the factory required, and, during the ten years that deliveries were made under the contract, received and treated approximately 400,000 cords of wood. The profits of its business averaged $5.66 per cord. Other provisions of the contract are referred to in the Board's opinion, but need not be repeated here.

██ Three witnesses testified to the value of the contract when the petitioner acquired it in September, 1912. Concededly there was no material change in value between that date and March 1, 1913. Two of the witnesses named a value of $800,000 and the other $1,-300,000. Their opinions were based upon an estimated profit of three or four dollars per cord and an estimated quantity of 400,-000 cords. But neither the actual nor the estimated profit of the business can be attributed solely to the value of the wood contract. It depends also upon the capital invested in the plant, the efficiency of labor and management, and success in marketing the manufactured product. Apparently every chemical company with which the witnesses were familiar made about $3 per cord on the wood treated prior to 1913, without reference to any specially favorable contract for purchasing the wood. The profits made or expected to be made in the business are not cogent proof of the market value of the wood supply contract in 1912. No one testified as to what the taxpayer would have had to pay to acquire a similar contract. Burt said that, if he had had the money, he would have paid $800,000 for the contract on September 30, 1912, but certainly such a statement need not be taken as conclusive evidence that the contract had a market value of that figure.

There is little reason to suppose that in 1912 and 1913 any one thought this contract had great value. It was negotiated as a business proposition between parties who were each trying to secure from the other the best possible terms. It was assigned by the Lackawanna Chemical Company without consideration. Its value became apparent later. The war greatly enhanced the market for chemicals and increased the price of chemical wood, but the war was not a factor which could have been foreseen in 1912. The actual profits of the petitioner were only $1.65 per cord in 1913 and 58 cents per cord in 1914; and the contract price of $4.45 per cord does not seem to have been very different from the then market price of chemical wood, as shown by what other chemical wood users were paying. Although Mr. Troy testified to a market value of $6.50 per cord, Mr. Quinn said the contract price would be a fair market price in 1913. Elsewhere Quinn says that such wood "would bring up to $5.00 or maybe $5.50 depending somewhat on the location of the wood and how near the wood is to a plant." Mr. Burt's company consumed about 17,000 cords which cost some $63,000. A large part of this, however, was the company's own wood having a stumpage cost of from 15 to 80 cents. The respondent's witness, Mr. Weinman, testified that he bought 4,000 cords from Norwich Lumber Company at $4 per cord. With these divergent views before it, the Board was not obliged to accept Mr. Troy's testimony of a market value of $6.50 per cord. The petitioner paid nothing for the contract, issued no stock against it, and did not set up any value on its books to represent it. Upon the entire evidence we think the Board was justified in rejecting the opinion evidence and finding that a market value of the contract was not proved.

This conclusion makes unnecessary a discussion of the petitioner's contention that the contract is "tangible property" within the definition of section 325, and should be deemed "paid in surplus" for purposes of invested capital as defined in section 326.

It is true that the petitioner paid a profits tax so high, being 62.8 per cent. of its net income for 1918, as to cause one to wonder whether it should not have had a special assessment under section 328 (40 Stat. 1094). But that question is not before us, and the seeming disproportion between its profits tax and invested capital is not material to the issue here presented.

Order affirmed.