JOHN R. HOLMES AND MARIE L. HOLMES, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3864–70SC. Filed December 27, 1971.

*Max Myers* and *L. Thomas Elliston*, for the petitioners.
*Wayne A. Smith*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioners' income tax of $392.72 for the taxable year 1967. The question presented for our decision is whether petitioners are entitled to charitable deductions in respect of petitioners' donation of two film productions to certain charities, and, if so, what the fair market values of those productions were at the time of donation.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and any exhibits attached thereto are incorporated herein by this reference.

Petitioners were husband and wife residing in Joplin, Mo., at the time of the filing of the petition herein. They filed a joint Federal income tax return for the taxable year 1967 with the district director of internal revenue in St. Louis, Mo. Because Marie L. Holmes is a party to these proceedings only by virtue of having filed a joint return, John Holmes will hereinafter be referred to as petitioner.

Petitioner is an independent film producer as well as the president of a small oil company. However, his primary vocation is that of general sales manager for a television station. In conjunction with his job at the television station petitioner has a weekly television show of his own called "The Johnny Holmes Show." Petitioner produces and emcees this weekly show and supervises all of its aspects except for engineering. The show, which has strictly local appeal, deals basically with outdoor subjects such as hunting and fishing.

In addition petitioner produces approximately six television specials every year. On his special shows petitioner has aired programs dealing with such varied subjects as farming, dancing, local colleges, and local industries.

Each film that petitioner produced as an independent film producer required individual treatment. Before actual filming it was necessary to prepare a "story-board" in order to anticipate the type of pictures to be shot and the different angles from which they should be shot. Furthermore, it was necessary to make notes or to prepare a complete script before actual filming began. And, on account of such factors as changing weather conditions, some films were harder to produce and consumed more production time than others.

To aid in his film production activities petitioner owned between $10,000 and $15,000 worth of equipment including a sound movie camera, three or four silent-movie cameras, slide cameras, tape recorders, microphones, and editing machines. In addition, he was constantly buying new items which he believed would enable him to do his job better. He also read and kept up with the latest magazines in the television film and industrial film trades.

As an independent film producer, petitioner received business in various ways. Having lived in his community since 1948, petitioner naturally knew many people and many people knew him. Thus, he had sometimes been requested to produce a specific film of specific length. Other times he had approached potential sponsors in order to solicit their financial aid for films on a particular subject. And, on some occasions petitioner had produced films before and in anticipation of finding sponsors.

When a television station produces films, it usually retains them. But as an independent film producer, petitioner could buy time on

television to air films he had produced and thereafter he could do whatever he wanted with the completed films. He aired most of the films he produced. Usually he later sold the films to the parties who had originally desired their production. Petitioner charged to air films on television and also charged if interested parties decided to buy films. Sometimes he sold both television time and completed film together in a package deal.

Sometimes after having shown a completed film on television, petitioner donated the film to an interested party. Thus, during 1967, petitioner made a gift of a 15-minute color film to St. John's Hospital (hereinafter referred to simply as the hospital), Joplin, Mo., and a gift of a 30-minute color film to the Boys' Club of Joplin, Mo. (hereinafter referred to simply as the boys' club). It has been stipulated that both the hospital and the boys' club are qualified charitable organizations within the purview of section 170.[1]

The film donated to the hospital was based upon a musical comedy stage show called "Cardiac Capers." The participants in "Cardiac Capers" were doctors, nurses, and others associated with the hospital. The purpose of the stage show was to raise funds for the cardiac center at the hospital. Petitioner shot the film and aired it on television after the stage show was over. He also aired the film on television the following year in order to generate interest for that year's stage show, the intention being to further aid in the solicitation of contributions to the hospital's cardiac center.

The film donated to the boys' club depicted the boys' club's various activities and showed the poor condition of its facilities. As the boys' club had been having a hard time getting started, it was necessary to generate some local interest for it. Therefore, petitioner aired the film on television in order to publicize the boys' club's need for improvement. After he had shown the film on television petitioner donated it to the boys' club which thereafter showed the film to various civic groups.

It was understood by petitioner and both the hospital and the boys' club that the two films would be donated to the respective charities after being aired on television. But, if petitioner had not donated the films, he would have made every effort to sell them to someone. For example, because the film donated to the hospital showed a lot of local faces it might have been sold to the local medical association. It was also conceivable that a large company needing an improvement of its public relations would have bought either of the films.

At the time of trial and during the relevant period herein, petitioner customarily sold film of the type donated to the hospital and

---

[1] Unless otherwise specified all section references are to the Internal Revenue Code of 1954.

the boys' club at the rate of $100 per minute of film. Of two other film producers in petitioner's field, one, a local photographer in Joplin, charged $100 per minute for film of the type donated to the hospital and the boys' club and the other, a large company located in Kansas City, charged a minimum of $250 per minute for any type of film.

Repeat showings of documentary films such as those donated to the hospital and the boys' club would not appreciably depress their value, the reason being that such films had rerun value, not only on the station on which they were originally aired but also on other television stations. For example, because they have retained their topical value some of petitioner's shows have been rerun three or four times over the years.

In 1967, petitioner incurred expenses in connection with producing the films donated to the hospital and boys' club. These expenses amounted to $120 for the donation to the hospital and $225 for the donation to the boys' club.

In 1967 petitioner showed a net profit of $735.97 derived from the sale of films and from sponsors who paid him to air films on television. This amount was calculated as follows:

| | | |
|---|---:|---:|
| Gross receipts | | $13,786.00 |
| Costs: Television time | $9,140.60 | |
| Processing of film | 776.01 | |
| Less: Processing of 2 donated films | (345.00) | |
| | 9,571.61 | |
| Gross profit | | 4,214.39 |
| Other business deductions: | | |
| Depreciation | 490.58 | |
| Insurance | 60.00 | |
| Legal and professional fees | 257.35 | |
| Expenses for office maintained in personal residence | 638.43 | |
| Travel | 1,877.06 | |
| Dues and subscriptions | 155.00 | |
| | 3,478.42 | |
| Net profit | | 735.97 |

Wages of $12,696.22 paid by the Gilmore Broadcasting Corp. constituted petitioner's only other gross income for 1967.

Petitioner claimed deductions (to the extent allowed by the percentage limitations of section 170(b)) for charitable contributions of the films to the hospital and boys' club. In claiming those deductions

he reported fair market values of $1,500 and $3,000 for the films donated to the hospital and boys' club, respectively. Respondent disallowed the deductions claimed with respect to the donation of the two films. Accompanying the notice of deficiency, respondent's only explanation for this disallowance was that:

Based on information available, it appears the 2 films produced for and donated to the Boys Club of Joplin and St. John's Hospital covered subject matter directly related to these organizations and of value only to these organizations. It therefore appears it is not possible to establish a fair market value of the films donated.

OPINION

In 1967, petitioner, whose primary vocation was that of general sales manager of a television station but who also conducted a business as an independent film producer, donated one of his film productions to each of two charities, the hospital and the boys' club. In his 1967 income tax return he claimed that the donations of the productions constituted charitable contributions for which deductions from gross income should be allowed to the extent allowed under section 170. He reported the value of the productions donated to the hospital and the boys' club as $1,500 and $3,000, respectively.

Within certain limits, section 170 allows as a deduction from gross income any "charitable contribution," payment of which is made within the taxable year. A "charitable contribution" is defined as a "contribution or gift to or for the use of" certain specific classes of organizations. Sec 170(c). The parties agree that the hospital and the boys' club qualify as members of these specific classes.

The regulations elaborate upon and clarify the statute. Thus, "No deduction is allowable for contribution of services." Sec. 1.170-2 (a)(2), Income Tax Regs. And, if a charitable contribution is in property other than money, section 1.170-1(c)(1), Income Tax Regs., sets forth the following guidelines:

(c) *Contribution in property*— (1) *General rules.* If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the lowest usual market in which he customarily sells, at the time and place of the contribution (and in the case of a contribution of goods in quantity, in the quantity contributed). The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, unless he sells only at retail in which event it is his

retail customers. If a donor makes a charitable contribution of, for example, stock in trade at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not the usual selling price but is the amount for which the quantity of merchandise contributed would have been sold by the donor at the time of the contribution. Costs and expenses incurred in the year of contribution in producing or acquiring the contributed property are not deductible and are not a part of the cost of goods sold. Similarly, to the extent that costs and expenses incurred in a prior taxable year in producing or acquiring the contributed property are reflected in the cost of goods sold in the year of contribution, cost of goods sold must be reduced by such costs and expenses. * * *

Respondent raises two objections to the allowance of deductions in respect of petitioner's donations. First, he claims that the donations do not qualify for charitable deductions because they were in the nature of services rather than of property. Second, he urges that even if the donations were of property, petitioner has failed to establish their fair market value.[2]

With respect to his first objection respondent states that—"it is evident that the two necessary components of a film are equipment and the services of the producer of the film." He then concludes that the component attributable to petitioner's services is not deductible because section 1.170–2(a)(2), Income Tax Regs., precludes charitable deductions for the contribution of services.[3]

At first glance it would appear that the facts here fall within the purview of section 1.170–1(c)(1), Income Tax Regs. That section of the regulations contemplates that a manufacturer or other pro-

---

[2] In the original notice of deficiency respondent's explanation of adjustments to petitioner's tax liability alluded only to this second ground. It was not until his opening statement at trial that respondent presented the alternative argument that petitioner's donations were in the nature of services. Although petitioner suggests that there are shortcomings in respondent's advocatory approach to this case, he does not contend that he was thereby surprised or misled. Therefore, we shall consider both of respondent's contentions. Compare *Rozelle McSpadden,* 50 T.C. 478, 491–493 (1968), with *Tirzah A. Cox,* 56 T.C. 1270, fn. 4 (1971).

[3] Although sec. 170 does not specifically prohibit deductions for the value of services rendered to charitable organizations of the type listed in sec. 170(c), it was early ruled that the rendering of services does not constitute a proper basis for the allowance of charitable deductions. O.D. 712, 3 C.B. 188 (1920), declared obsolete Rev. Rul. 69–31, 1969–1 C.B. 307. That ruling, which is now embodied in sec. 1.170–2(a)(2), Income Tax Regs.—

appears to be based upon tax administration problems involved in verifying and measuring the fair market value of personal service donations. In addition, the disparity in the value of personal services among taxpayers, as well as the question of whether or not the donor has actually parted with anything when he donates his personal services, have apparently influenced the Commissioner's decision. [Alvin, "Charitable Contributions: 'Fruit' and 'Tree,' " 118 J. of Accountancy 38, 39 (July 1964).]

Accord, Rudick & Gray, "Bounty Twice Blessed: Tax Consequences of Gifts of Property to or in Trust for Charity," 16 Tax L. Rev. 284 (1961). We should note that while the case law supporting the Commissioner's distinction between donations of services and donations of property is meager, see Eliasberg, "Section 170: Recent Developments on the 'What', 'When' and 'How much' of Charitable Giving," 44 Taxes 434–435 (1966); cf. *Threlfall* v. *United States,* 302 F.Supp. 1114 (W.D. Wis. 1969), petitioner does not contend that sec. 1.170–2(a)(2), Income Tax Regs., is invalid.

ducer may claim a deduction with respect to a contribution made in property of a type which he sells in the course of his business. In adding the cost of processing the two donated films to gross receipts, petitioner faithfully followed that section's requirement that: "Costs and expenses incurred in the year of contribution in producing or acquiring the contributed property are not deductible and are not a part of the cost of goods sold." Here, respondent admits that petitioner is in the business of producing film.[4] It is also clear that the donated films constituted property of the type which petitioner normally sold in the course of that business. On its face, then, section 1.170–1(c)(1), Income Tax Regs., would allow petitioner to deduct the fair market value of the films.

However, if there is any merit in respondent's argument that what petitioner actually contributed was services, section 1.170–2(a)(2), Income Tax Regs., would prohibit a deduction for that contribution. In order to determine under which of these two regulations the present factual situation falls, we must delimit their applicability. In effect we must differentiate between contributions of property and contributions of services.

In the senses that are useful to our discussion, "property" is variously defined as "something that is or may be owned or possessed," "the exclusive right to possess, enjoy, and dispose of a thing," and "something to which a person has a legal title"; while "services" may be variously defined as acts "done for the benefit or at the command of another," actions "that further some end or purpose," conduct "that assists or benefits someone or something," and "deeds useful or instrumental to some object." Webster's New International Dictionary, pp. 1818, 2075 (3d ed. 1961). If the dictionary definitions are followed, the notion of physical ownership provides one significant measure for distinguishing between property and services. Thus, property is something which may be physically owned or possessed while services, because of their inherently ephemeral nature, are incapable of being so held.

In the instant situation it cannot be denied that petitioner applied his talents to transform unprocessed film into film productions. But long before the time of each donation, his services had coalesced with the unprocessed film to form something different from both his services and the unprocessed film. By his talents he added value to unprocessed film in the same way that an artist adds value to canvas by

---

[4] It has been implied that a distinction should be made between contributions in property of the type which the contributor sells in the course of his business and contributions in property of a type produced as a hobby or from activities which could not be categorized as constituting a trade or business. Alvin, "Charitable Contributions: 'Fruit' and 'Tree,'" 118 J. of Accountancy, 38, 40 (July 1964).

painting works of art, that a cartoonist adds value to paper by drawing cartoons, or that a farmer adds value to crops or cattle by applying the skills of husbandry.[5]

Each film production was a tangible commodity which could be physically owned or possessed. Petitioner did in fact own each film production for a significant period. During that period of ownership he used each production for his own purposes on his television show. Until the ultimate moment of donation each production remained in his possession. When he did make the donations, each donation was a donation of his ownership in a film production. That ownership had a value separate from the services which went into production.[6]

The distinction between property and services may, at times, be blurred indeed, but so long as we are presented with a matrix in which that distinction is deemed determinative of tax liability we are forced to make the necessary differentiation. Thus, where respondent's regulations create a distinction between contributions of property and contributions of services and where the parties do not challenge the validity of that distinction, we must apply that distinction to the facts before us even if such application requires us to strain the limits of semantic comprehension.[7]

What is really troubling in this case is not the allowance of charitable deductions for petitioner's contributions, but the seeming failure of

[5] Several cases have allowed to a donor charitable deductions directly attributable to value added to donated property by the donor's skills. *Campbell* v. *Prothro,* 209 F.2d 331 (C.A. 5, 1954) (cattle rancher) ; *Walker* v. *United States,* an unreported case (D. Conn. 1969, 24 A.F.T.R. 2d 69–5054, 69–2 U.S. T.C. par. 9485) (cartoonist) ; *White* v. *Brodrick,* 104 F. Supp. 213 (D. Kan. 1952) (wheat farmer) ; *Cambridge Hotels, Inc.,* T.C. Memo. 1968–263 (painter) ; *Charles J. Kuderna,* T.C. Memo. 1965–143 (painter) ; *Hilla Rebay,* T.C. Memo. 1963–42 (painter). However, in none of those cases was it argued that a deduction for the value added should be denied on the ground that the donation of the value added was a contribution of services. Cf. *William Fow,* T.C. Memos. 1968–154, affd. (C.A. 2, 1969, 24 A.F.T.R. 2d 69–5866, 69–2 U.S.T.C. par 9737), 1965–195, and 1963–247.

[6] It may be true that there was an understanding between petitioner and both the boys' club and hospital that he would donate the productions to those charities after having aired them on television. But respondent does not suggest that these understandings gave to either the hospital or the boys' club any kind of enforceable rights which might have detracted from petitioner's ownership in the productions.

The guideline we employ today does not conflict with the rationale underlying the denial of charitable deductions for the contributions of services. See fn. 3 *supra.* As related by the commentators, one reason for that denial lies in the administrative difficulties attendant upon the valuation of services. But where what is to be valued is something tangible such as a film production the fact that the production is donated by its producer rather than by a nonproducer should not drastically affect the valuation process. Secondly, the argument that artists and craftsmen are thus in a better position than the rest of the populace to take advantage of the provisions of sec. 170 provides no more reason to deny artists and craftsmen deductions for contributions of their own creations than would be a similar argument denying charitable deductions to the rich on the ground that they are in a better financial position than the poor to take advantage of the provisions of that section.

[7] We are quick to admit that in distinguishing between property and services we have merely shifted the controversy to a different definitional level. Thus, the distinction we strike today places importance upon the notion of physical ownership, but upon further analysis, how are the terms "physical" and "ownership" to be defined?

the Internal Revenue Code as it stood in 1967 to require petitioner to report as gross income the difference between the fair market value of the productions and his original out-of-pocket cost or basis in them. (Cf. the cases cited in footnote 5, *supra*.)

The availability of tax benefits to those making charitable contributions of appreciated property has been common knowledge for some time.[8] The chief benefit lay in the fact that a deduction for a charitable contribution of property could be taken at the property's fair market value while the difference between the contributor's basis and the fair market value would never be reported as gross income. At one point the Commissioner sought to limit this benefit by ruling that in situations where farmers had made contributions of their own crops to qualified charities such farmers should include the fair market value of the crops in gross income. I.T. 3910, 1948–1 C.B. 15; cf. I.T. 3932, 1948–2 C.B. 7. This ruling generated much controversy. E.g., Miller, "Gifts of Income and of Property: What the *Horst* Case Decides," 5 Tax L. Rev. 1 (1949); Griswold, "Charitable Gifts of Income and the Internal Revenue Code," 65 Harv. L. Rev. 84 (1951); Bittker, "Charitable Gifts of Income and the Internal Revenue Code: Another View," 65 Harv. L. Rev. 1375 (1952); Griswold, "In Brief Reply," 65 Harv. L. Rev. 1389 (1952). The courts later rejected the ruling's reasoning. *Campbell* v. *Prothro*, 209 F.2d 331 (C.A. 5, 1954); *White* v. *Brodrick*, 104 F.Supp. 213 (D. Kan. 1952); see also *Elsie SoRelle*, 22 T.C. 459, 476–479 (1954); *Estate of W. G. Farrier*, 15 T.C. 277 (1950). Upon this rebuff by the courts, the Commissioner relented and revoked his ruling while at the same time establishing some of the principles which were later embodied in section 1.170–1(c)(1), Income Tax Regs. Rev. Rul. 55–138, 1955–1 C.B. 223, modified by Rev. Rul. 68–69, 1968–1 C.B. 80; cf. Rev. Rul. 55–531, 1955–2 C.B. 520.

It was not until the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, that Congress acted to substantially curtail the availability of some of the benefits accompanying charitable contributions of ap-

---

[8] Perhaps less commonly known were the advantages available to manufacturers or producers making charitable contributions of their own inventory. For example, a sole proprietor like petitioner could have made enough charitable contributions of property of a type sold in the course of his business to take full advantage of the percentage limitations of sec. 170(c). Carrying this reasoning to an extreme, it is conceivable that by having contributed a sufficiently large proportion of his substantially self-produced inventory an individual in petitioner's position might have tried to take advantage of the unlimited deduction allowed by sec. 170(b)·(1)(C). See Rudick & Gray, "Bounty Twice Blessed : Tax Consequences of Gifts of Property to or in Trust for Charity," 16 Tax L. Rev. 273, 284, fn. 47 (1961). Congress has acted to limit these bonanzas. Sec. 170(b)·(1)(C) is now being phased out by sec. 170(f)(6) and as described in the body of the opinion, sec. 170(e) reduces the amount allowable as deductions in respect of charitable contributions of "ordinary income" property.

preciated property. In particular, in the case of so-called "ordinary income" property, section 170(e) now provides that—

> (e) CERTAIN CONTRIBUTIONS OF ORDINARY INCOME AND CAPITAL GAIN PROPERTY.—
>> (1) GENERAL RULE.—The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of—
>>> (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), and

Having decided that the films which petitioner donated were charitable contributions within the meaning of section 170, we turn now to a determination of their fair market value.

At trial petitioner testified at length as to the fair market value of the two film productions. In contrast, respondent failed to call any witnesses and failed to present any evidence to help us in our determination of that value.

The thrust of respondent's argument is that petitioner has failed to meet his burden of showing that a willing buyer would have paid $100 per minute, or any price, for these two films. In essence, respondent is asking us to completely disregard petitioner's testimony for the reason that it is self-serving and uncorroborated. We are unable to grant respondent's request.

While the taxpayer has the burden of proof in proceedings before this Court and while we frequently have disregarded self-serving and uncorroborated testimony, the taxpayer need not be forced to hire valuation experts where, as here, his own testimony is credible and founded upon reasonable factual premises. Petitioner's testimony was sufficiently persuasive to overcome the presumptive correctness of respondent's determination of deficiency. In the absence of evidence to the contrary, we accept his testimony and hold that the valuation factors he divulged more than adequately supported his opinion, as owner of the films, that the fair market values of the films donated to the hospital and the boys' club were $1,500 and $3,000, respectively.

*Decision will be entered for the petitioners.*