MAURICE JARRE AND MARY LOUISE JARRE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6546-73.    Filed May 7, 1975.

*Eli Blumenfeld,* for the petitioners.
*Stephen W. Simpson* and *Jonathan A. Brod,* for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies of $28,116 and $34,028 in the Federal income taxes of petitioners for the calendar years 1967 and 1968, respectively. The sole issue [1] presented requires our determination of the fair market value of certain original music manuscripts and related material contributed by petitioner Maurice Jarre to the University of Southern California in 1967 and 1968 for purposes of computing the amount of deductions for charitable contributions to which

---

[1] In his notice of deficiency respondent also determined that petitioners did not own the contributed material. Respondent has since conceded this aspect of petitioners' claimed deduction.

petitioners are entitled under section 170, I.R.C. 1954.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners are husband and wife whose legal residence at the time of filing the petition was in Beverly Hills, Calif. They filed joint Federal income tax returns for the calendar years 1967 and 1968 with the District Director of Internal Revenue at Los Angeles, Calif.

Petitioner Maurice Jarre (hereinafter Jarre) is a music composer and conductor of international reputation. Jarre has been a composer and conductor for some 25 to 28 years. He began his music career in Lyons, France, and then studied in Paris at the National Conservatory Music. Jarre, along with Pierre Boulez (currently the music director of the New York Philharmonic Orchestra), then became the music adviser to the newly formed Jean-Louis Barrault Theater Co. in France where he remained for 4 years. Jarre subsequently became music director and conductor for the French National Theatre in 1951, positions he held for 12 years. During this period petitioner was responsible for the music budget, composed the music for all plays, including "Macbeth," "Oedipus," "Antigone," and "The Hairy Ape," and conducted the orchestra for all plays and concerts. He also composed music for French films, radio broadcasts, a ballet, and television program.

In 1964 Jarre moved to and became a permanent resident of the United States. He has since composed music for approximately 50 American films. Some of Jarre's scores for American films include "Lawrence of Arabia," "Topaz," "Ryàn's Daughter," "Dr. Zhivago," "Is Paris Burning?," "Grand Prix," "The Longest Day," and "Night of the Generals." Jarre generally prepares all elements, including arrangements and orchestration, of the film scores he composes and sometimes conducts the music for the sound track.

---

[2] All Code references are to the Internal Revenue Code of 1954, as amended and as applicable to the taxable years involved. We note here that the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, prescribes new rules for allowable deductions for charitable contributions of the type of property involved herein donated after July 25, 1969.

Jarre has a classical music background and has written symphonic music, ballet and opera music, and also electronic music called musique concrete. He has conducted well-known symphony orchestras in a number of foreign nations. His most publicized success, however, has come in the field of popular culture music and, more particularly, in music for film. Jarre is considered by his peers to be one of the top 10 composers of music for film in the world and he is one of the most sought after composers in the film industry.

Jarre is a member of the American Society of Composers, Authors and Publishers (ASCAP) as a publisher. He is also a member in the highest rank of the Society for Authors, Composers and Publishers (SACEM) as a composer. An individual is not permitted to be a member of both organizations in the same category. Jarre has served on a number of committees and advisory groups dealing with music both in France and in the United States. There is a large number of books and magazines containing biographical material about Jarre and his career in music, of which a sampling of some 53 (American and foreign) was placed in evidence in this proceeding. In addition, a good deal of his music, both American and foreign, has been recorded.

Jarre has won two Academy Awards (for the scores for "Lawrence of Arabia" and "Dr. Zhivago"), a Golden Globe award, and he has received three other Academy Award nominations. He has also received a number of awards of comparable importance in France (such as the chevalier des Arts et Lettres), Germany, England, and Italy.

In his capacity as a composer, Jarre has created numerous original works, some of which have been contributed to the University of Southern California and the University of Wyoming after solicitation of his material by those schools. In response to requests, in 1967 and 1968 Jarre contributed certain original music manuscripts and other related material to the University of Southern California. The following property rights were not conveyed as part of the 1967 and 1968 gifts: all copyrights; rights of publication in book form; rights of serialization; magazine and newspaper rights; reprint rights; and book club rights or dramatization rights.

The 1967 and 1968 gifts include the music manuscripts and related material to some 14 of Jarre's American films, 10 French films, 10 plays, 2 ballets, and a number of French radio and tele-

vision productions and consist of over 4,000 pages. The material consists mainly of Jarre's original and generally complete working (as opposed to finished) manuscripts of musical scores and sketches (some several hundred pages long) written in his own hand, some signed on a number of pages, and with annotations. Music notes, click track timing sheets, and cue sheets, generally annotated and sometimes completely in Jarre's hand, and some photocopies and typescripts of scores are also included. Among the contributed scores for American films were those for "Grand Prix," "Dr. Zhivago" (the music of which sold some 14 million tapes and records and some 1,500,000 lead sheets), "Night of the Generals," "Behold a Pale Horse," "Is Paris Burning?" and "Gambit." The condition of the donated material was very good.

Prior to and including the years in issue none of Jarre's original manuscripts or copies thereof had come on the market. Except for a few one-page fair copies of music from "Ryan's Daughter," "Dr. Zhivago," and "Lawrence of Arabia" which were sold to dealers for $50 to $75 in 1974 and three one-page fair copies of music from "Dr. Zhivago," two of which were sold to collectors for $300 and $325, respectively, in 1974 and one for $75 in 1972 none of Jarre's work has come on the market. A fair copy is a copy in the composer's own handwriting.

During the years in issue, Jarre retained one Milton Luboviski (hereinafter Luboviski), the proprietor of Larry Edmonds Book Shop, to appraise his donated material. Luboviski, who deals in cinema and theater material, appraised the donated material at the time of the contributions. His determinations of the fair market value of the donated material for 1967 and 1968 were $54,200 and $61,900, respectively. In 1971, Jarre retained one Charles Sachs, proprietor of the Scriptorium, to appraise his 1967 and 1968 gifts. Sachs' appraisal found the fair market values, as of the dates of contribution, of Jarre's materials contributed in 1967 and 1968 to be $61,996 and $35,918, respectively.

Respondent retained one Doris Harris, the proprietress of Doris Harris Autographs, to value the contributed material. In 1970 she appraised the 1967 and 1968 gifts at $5,875 and $2,775, respectively, as of the dates of contribution. On learning that some of the handwriting she attributed to a copyist was actually that of Jarre and upon a number of the donated manuscripts

becoming available for her inspection, which were not at the University of Southern California at the time of her original appraisals, Harris reappraised the 1967 and 1968 material in issue, as of the dates of contribution, at $7,615 and $4,915, respectively.

In their 1967 and 1968 income tax returns, petitioners claimed deductions of $54,200 and $61,900, respectively, for the contributions in question made by Jarre. In his notice of deficiency respondent disallowed the claimed deductions upon his determination that petitioners did not own the donated material, a point now conceded by respondent. In the notice of deficiency respondent alternatively determined that, in the event ownership of the donated material is established, the deductions for the years 1967 and 1968 would be limited by the fair market values thereof of $5,875 and $2,775, respectively. Respondent now has conceded that petitioners are entitled to deductions of $7,615 for 1967 and $4,915 for 1968, rather than the amounts stated in the notice of deficiency, but contends that no larger deductions are allowable.

### OPINION

The sole issue for decision relates to the amount of the deductions for purposes of section 170 to which petitioners are entitled for the contributions of original music manuscripts and other related material to the University of Southern California in 1967 and 1968. There being no issue as to the other requirements of section 170, the only question presented is the proper amount of the deductions, or the fair market value of the contributed property.

With respect to contributions of property, section 1.170-1(c)(1) of the Income Tax Regs. provides in part:

(c) * * * (1) *General rules.* If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *

Petitioners contend that the fair market values of the 1967 and 1968 gifts were $54,200 and $61,900, respectively, which amounts they deducted on their appropriate tax returns. It is

respondent's position that the fair market values of the donated property were $7,615 for 1967 and $4,915 for 1968.

The question of fair market value is one of fact which must be resolved from consideration of all the relevant evidence in the record. *Philip Kaplan,* 43 T.C. 663, 665 (1965). Both parties produced voluminous testimony, which we will not recount, of experts and others dealing in or familiar with property of the type in question in addition to a number of exhibits including the appraisal reports of the expert witnesses. In the interest of brevity, we have summarized only the highlights of such evidence in our Findings of Fact.

In resolving the issue of the fair market value of the gifts of music manuscripts and related material, we believe the following factors are included among those elements which we must, and have, considered in determination of the question at hand: the composer's standing in his field and popularity of his works in general; the critical acclaim and popular appeal of the particular works contributed; the relative place and importance of the contributed works in the composer's career; the condition and content of the contributed works; whether the contributed works are originals, fair copies, or photo copies, are written in the composer's own hand, are signed, or are in ink, pencil, or typed; the length of the individual contributed works and the sizes of the pages containing them; whether the mental processes of the composer are shown (i.e., working versus souvenir or finished manuscripts), including annotations; the demand in the marketplace for the type of works contributed and for the particular works contributed; the associative character of the contributed works (such as the film, its actors and actresses, its director, or its subject); the quantity, or conversely the rarity, of the contributed material (including whether the composer is dead or alive); and the length of time necessary to sell the contributed works.

In weighing the testimony and appraisals of the expert witnesses in this case, we have considered as important their demonstrated qualifications to form an opinion, their familiarity with the background and relative place of Jarre in his field, their choices of comparable sales, their familiarity and contact with the potential market for the contributed material, and their knowledge of the material. We also have considered the expert witnesses' relative expertise as judged and observed by us, the

time spent on and thoroughness of their appraisals, and their knowledge of the particular field both before and after research. See *Keystone Wood Products Co.,* 19 B.T.A. 1116, 1121-1122 (1930), affd. 66 F. 2d 258 (2d Cir. 1933).

In this respect, we note that the testimony of all three expert witnesses had instances of inconsistent, vague, and conclusionary statements. We think it important that petitioners' experts, especially Luboviski, deal daily in cinema memorabilia, while respondent's expert does not. Clearly, this does not make respondent's expert incapable of researching and evaluating the market for film music, but it is a factor we must consider in weighing respondent's expert's testimony. In fact, respondent's expert admitted she sends customers desiring cinema material to Luboviski because he deals in such items while she generally does not. In addition we think it significant that respondent's expert placed a great deal of significance on Jarre's absence from a 1959 edition book discussing 20 composers, despite the fact that Jarre's success and recognition, at least in the United States, came in the 1960's for film music. Furthermore, we believe the record shows that respondent's expert was not fully aware of Jarre's foreign accomplishments and reputation.

Respondent does not claim that Jarre is unknown among his professional associates. Respondent readily admits that Jarre is one of the top 10 composers of film music. Respondent also recognizes that the condition of the contributed materials is very good and, as his expert stated, their content and appearance is attractive and interesting. Nor does respondent contend that Jarre's contributed material has no value. Indeed, it would be odd for the University of Southern California to solicit Jarre's works if they had no value. Rather, respondent's position, apart from attacking petitioner's experts' appraisals, is that there is a very small, if any, market for the type of material donated or for Jarre's material in particular. As grounds for his argument respondent points to the lack of recorded sales of whole film scores, the lack of inquiries received by the witnesses in this trial concerning sales of Jarre's or anyone else's film scores, and Jarre's lack of name recognition among other than his professional associates. In addition, respondent asserts that the depressing effect on the market of the volume of Jarre's contributed material must be considered.

With respondent's latter contention, we agree. *Estate of David Smith*, 57 T.C. 650, 656-658 (1972), affd. 510 F. 2d 479 (2d Cir. 1975). However, with respect to respondent's first contention, the fact that there may be a limited market does not, in our opinion, prevent the contributed property from having substantial value. See *Publicker v. Commissioner*, 206 F. 2d 250 (3d Cir. 1953), affg. T.C. Memo. 1952-163, cert. denied 346 U.S. 924 (1954); *George P. Fisher, Executor*, 3 B.T.A. 679 (1926). It is, however, a factor to consider. *Estate of David Smith*, 57 T.C. at 655.

Considering the evidence of the instant case we do believe respondent has shown a somewhat limited market for lengthy and complete music manuscripts of film composers. There was testimony from petitioners' witnesses that they could recall only one or two sales of and few, if any, inquiries about such material. On the other hand, we think the longer manuscripts could, in some instances, be broken down into shorter, more salable units, if necessary. There was evidence submitted of a number of sales at substantial prices of short or one-page music manuscripts by popular culture composers with whom we think Jarre is comparable. In addition, we note that several of Jarre's one-page fair copies of his music (concededly worth less than original manuscripts) were sold between 1972 and 1974, some to dealers and some to collectors,[3] for substantial prices.

As for respondent's claim that Jarre has no name recognition except among his professional associates, we express no opinion except to state that we believe such fact, if true, to be of little value. We cannot doubt that Jarre's music for films such as "Dr. Zhivago" (the music of which sold some 14 million tapes and records) or "Lawrence of Arabia" is itself generally recognized and sought by the public. This in turn, we believe, adds to the desirability, and hence value, of his less familiar works. Further, we think Jarre's premier role in the field of writing music for films has been amply demonstrated.

After carefully considering all the evidence contained in the record, and with the usual obeisances to the vagaries of the judgment required by this case, we conclude, and find as a fact,

---

[3] The parties are in agreement that in the instant case it is the collector's purchase price, rather than dealer's, which is indicative fair market value.

that Jarre's 1967 and 1968 gifts in question had fair market values, at the times of contribution, of $45,000 and $31,000.

*Decision will be entered under Rule 155.*