JOHN A. CUPLER II AND MARGARET D. CUPLER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4743-73.    Filed August 26, 1975.

*Frank S. Deming* and *J. Shane Creamer,* for the petitioners.
*Alan E. Cobb,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1965 | $53,487.95 | 1968 | $105,248.90 |
| 1966 | 66,853.00 | 1969 | 49,920.08 |
| 1967 | 47,837.17 | 1970 | 66,128.92 |

Several issues have been disposed of by stipulation. Those remaining are:

(1) Did petitioner make a charitable contribution of medical equipment to the University of Maryland in 1967, and if so, what was its value?

(2) Did petitioner make a charitable contribution of medical equipment to St. Barnabas Hospital in 1969 and, if so, what was its value?

(3) What was the value of the building stone which petitioner contributed to Emanuel Episcopal Church in 1965?

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife. Their returns were filed with the District Director of Internal Revenue, Baltimore, Md. On the date the petition was filed, petitioners resided in LaVale, Md. Mrs. Cupler is a petitioner only because she filed joint Federal income tax returns with her husband for the years 1965 through 1970. Mr. Cupler is referred to herein as petitioner.

## 1. *Medical Equipment*

Petitioner is a highly successful engineer and inventor in the field of precision drilling equipment. He is the president of the National Jet Cos., which manufacture and market small and microscopic precision drills and related equipment, primarily for the diesel engine industry. Petitioner has produced at least 50 patents on inventions in this field since he entered the business in 1937. He is not, however, in the business of inventing or manufacturing medical equipment of any kind.

### *Cataract Machine*

At some time during 1965 or early 1966, petitioner's father was hospitalized at the University of Maryland Hospital with an eye ailment. At that time, petitioner met Dr. Alfred A. Meisels, an ophthalmologist who was treating his father and was on the staff of the hospital. Dr. Meisels discussed with petitioner the former's dissatisfaction with the prevailing surgical method of removing cataracts. That method required a 180° incision around the iris of the eye and the removal of the diseased lens. Dr. Meisels wanted to develop a procedure whereby the sheath of the lens would be penetrated, its cataractous contents removed, and the sheath refilled with pure silicone. Ideally, such a

procedure, besides minimizing the risks of the operation itself, would result in the restoration of normal vision by avoiding the impairment necessarily resulting from the complete removal of the lens. At the time petitioner was first contacted, he was informed that the University could not afford to pay for the development of the machine which would enable this procedure to be performed. Petitioner replied that payment would not be necessary.

Petitioner decided to try to develop such a machine. Several problems had to be solved in the design of the machine. Necessary operations included penetration of the eye without damage; mastication and removal of the gelatinous and fibrous contents of the lens; flushing out the lens sheath; and injection of silicone. It was necessary for petitioner to spend considerable time acquiring the background knowledge essential to the project.

Petitioner experimented with attempting to extract the contents of gelatine capsules. In the summer of 1966, Dr. Meisels and a colleague from the hospital staff, Dr. Stanley Schocket, visited petitioner and discussed the development of the device with him.

An early version of the machine proved unsuccessful in penetrating the eye of a rabbit without damage. Petitioner solved this problem by cutting the bevel off a hypodermic needle and tapering the tip of the needle down from the outside to the inside. This "cookie cutter" effect, in connection with a low-speed drill passed down the center of the needle, permitted the operator to augur a hole through the tissue of the eyeball without damage, creating a wound so small that it was self-closing. Two needles could be inserted in the lens in this manner facilitating the replacement of the lens material with silicone.

Petitioner delivered the machine to Drs. Meisels and Schocket in February 1967. At that time, he had not satisfactorily solved the problem of removing the gelatinous and fibrous materials from within the lens sheath. This difficulty was subsequently resolved by the development of a "tricep" tool, consisting of three wires with grasping feet. The tricep tool was inserted into the lens through the hollow needle and rotated, chopping the lens contents which were then removed by suction. Its grasping feet helped to withdraw lens fibers when the tool was retracted through the needle.

Petitioner spent a substantial number of hours preparing himself and developing the cataract machine prior to February 1967. It has been returned to him on occasion for reworking since that time. The machine has never been used clinically for its intended purpose. It has been used in repairing an obstructed tearduct and in research. Another machine of the same design was later donated to the Washington Hospital Center, where it has had some clinical use in removing substances imbedded in the vitreous of the eye.

Petitioner incurred out-of-pocket expenses of at least $7,158.53 in developing the cataract machine, which respondent has allowed as a charitable deduction.

Petitioner first applied for a patent in his name on the cataract machine in 1972. No patent has been issued. No rights in the invention, other than ownership of the particular machine donated in 1967, have ever been transferred to the University of Maryland, although petitioner intended to transfer the patent rights to the University of Maryland when the patent issued.

In 1967, the machine was unique in the sense that no other device had been developed for the same purpose. The cataract machine is similar to a device known as the roto-extractor, also referred to as the Kemp or Douvas machine. This machine required 5 years and over $100,000 to develop, and was first marketed in 1972 at a price of $7,000. It sold for $9,000 in 1974. About 45 roto-extractors were in use in the United States at the time of the trial of this case, and have been used to remove cataracts as well as to remove blood from the vitreous cavity. The principal differences between the two machines are in the size of the tip of the instrument—the roto-extractor, which requires an incision in the eye, has a tip approximately 3 times as large as that of petitioner's machine—and in petitioner's use of millisecond timers to control pressure and suction. The millisecond timers were not a part of the machine donated to the University in 1967.

Petitioner did not deal with any representative of the University other than Drs. Meisels and Schocket regarding this machine. On occasion, Raymond W. Colton, petitioner's patent attorney, acted as intermediary between him and the doctors.

On February 13, 1967, the doctors wrote petitioner a letter of thanks for his contribution, on University stationery. Drs. Meisels and Schocket believed they were acting on behalf of the

University in soliciting and accepting the gift. They did not know that University policy required formal administration acceptance. During the time period in question, it occasionally happened that persons accepted gifts on behalf of the University without such formal acceptance.

The cataract machine was not listed on the cumulative property inventory maintained by the University's Department of Ophthalmology, where it was physically located at all times after its donation. That inventory was prepared by the University on the basis of documents rather than physical inspection.

Dr. Meisels left the University's employ some time prior to the trial of this case. The cataract machine remained at the University.

One of petitioner's expert witnesses based his valuation of the cataract machine on the cost of several projects claimed to be comparable, allegedly ranging from $100,000-plus to $1 million-plus. Petitioner's other expert witness valued the machine in terms of similar costs, ranging from $70,000 to $250,000, and in terms of his estimate of what it would cost for development of such a machine as follows:

| | |
|---|---|
| (1) Preprototype stage | $62,000 |
| (2) Development of a prototype | 54,500 |
| (3) Production of working model | 28,000 |
| Total | 144,500 |

### Heart-Lung Machine

From 1963 to 1970, Dr. Jacob Zimmerman was a member of the medical staff of St. Barnabas Hospital for Chronic Diseases, New York, N.Y. During that time (and thereafter), he conducted research in cardiac anatomy under various Government grants. His research included investigation of the relationship between the heart and lungs in the development of the embryo. He wanted to develop a tool for use in his research that could remove and transplant the developing lung buds of 3-day-old chicken embryos.

In 1966, Dr. Zimmerman consulted petitioner, who had been recommended as a person who might be able to assist in the development of such a machine. It was necessary for petitioner to spend considerable time acquiring the background knowledge essential for the project. Petitioner spent a substantial number of

hours over a period of 3 years in so preparing himself and in developing a tool that would perform the necessary operations. By 1969, he had invented a machine using the "cookie cutter" concept with a low RPM drill of absolute measurable concentricity, capable of penetrating the egg albumin without curdling it or causing the displacement of the embryo, passing without damage between blood vessels with a clearance of two-and-one-half thousandths of an inch at an angle varying within a range of 180° in the horizontal and 190° in the vertical directions, and excising the lung bud by means of suction and slow rotation of the cookie-cutter needle. Besides developing the actual tool—referred to herein as a heart-lung machine—he devised delicate control mechanisms and a system of micro-manipulators for holding the embryo in place while the operation was performed. The optics for the heart-lung machine were those designed for use generally on microdrilling equipment. The machine was delivered to Dr. Zimmerman in 1969.

Before receiving the heart-lung machine, Dr. Zimmerman working alone had succeeded in this operation at most once out of 500 trials. Using petitioner's machine, he or a technician assistant could accomplish the operation in one out of every two attempts.

Petitioner incurred out-of-pocket expenses of at least $4,479.84 in developing the heart-lung machine.[1]

No patent application has ever been filed with respect to the machine.

Petitioner did not deal with any representative of St. Barnabas other than Dr. Zimmerman regarding this machine. A version of the machine was used by Dr. Zimmerman at the hospital as early as 1966, but this was not the machine which petitioner claims to have donated in 1969.

Dr. Zimmerman was referred to petitioner by an employee of the Hirschmann Corp., who indicated to petitioner that it was the hospital which sought to acquire the machine. Dr. Zimmerman wrote letters to petitioner and to Hirschmann Corp. on hospital stationery.

---

[1] Although many of these expenses were incurred prior to 1969, respondent concedes that such amount is allowable as a charitable deduction in 1969 if the Court finds that a gift of the machine was made to the hospital in 1969.

The hospital administration was not officially informed of the donation of the machine in 1969. Dr. Zimmerman's superiors knew of the machine and considered it hospital property.

Dr. Zimmerman began his research under a grant from the National Institutes of Health. In 1968, that grant terminated and he was transferred to the hospital payroll. He sought renewal of his grant, which was denied for the last time in 1970. In 1970, Dr. Zimmerman moved to Israel, where he joined the staff of the University of Tel Aviv. Before leaving St. Barnabas, he asked and received the permission of the hospital administration to take the heart-lung machine with him.

Dr. Zimmerman was the only person doing the sort of research for which the machine was designed. Only he and a technician at St. Barnabas were trained to operate it. Since 1970, the machine has remained in Israel.

On November 29, 1972, at the request of petitioner's counsel, St. Barnabas wrote petitioner a letter acknowledging that the heart-lung machine was received in 1969 and that Dr. Zimmerman was permitted to take it with him to Israel in 1970. Dr. Zimmerman wrote a similar letter to petitioner on March 31, 1970. During 1969, no official record of the donation was made in the hospital files.

Petitioner's expert witness valued the heart-lung machine in terms of his estimate of what it would cost for development of such a machine, as follows:

| | |
|---|---:|
| (1) Preprototype stage | $80,640 |
| (2) Development of a prototype | 36,350 |
| (3) Production of working model | 33,000 |
| Total | 149,990 |

## 2. *Building Stone*

In May 1965, petitioner purchased a quantity of building stone for $646. The stone was being removed from a 19th century mansion in Cumberland, Md. It had originally been cut from local quarries which were no longer in operation in 1965. Because of its origin, the stone was of particular value for the repair or enlargement of buildings in Cumberland constructed of stone from the same quarries. It consisted of several types of individual stones, which varied in value according to their size, the manner in which they were cut and shaped, and their condition.

The Emanuel Episcopal Church in Cumberland sought to acquire the stone from the contractor responsible for razing the mansion but learned that it had already been sold to petitioner. The church wanted the stone for the construction of an addition to its existing structure, which had been built with the same type of local material. On request, petitioner agreed to donate the stone to the church and did so in June 1965.

After acquiring the stone and up to the time of trial, the church stored it for future use. Some of it was kept in the parking lot of a local brewery, where it was eventually covered with cinders to reduce danger of pilferage and damage. In addition to the purchase price, petitioner incurred out-of-pocket expenses of $2,525.51 in implementing his donation to the church through the removal and transportation of the stone.

### ULTIMATE FINDINGS OF FACT

Petitioner donated a cataract machine to the University of Maryland in 1967 having a fair market value of $10,000 at that time.

Petitioner donated a heart-lung machine to St. Barnabas Hospital in 1969 having a fair market value of $15,000 at that time.

Petitioner donated stone to the Emanuel Episcopal Church in 1965 having a fair market value of $12,000 at that time and incurred $2,525.51 out-of-pocket expenses in implementing that donation.

### OPINION

Before proceeding to the principal problem in this case—namely, valuation of two pieces of specialized medical equipment—we will dispose of some subsidiary matters. At the trial, respondent raised, by way of amended answer, the issues whether petitioner made a donation of the cataract machine to the University of Maryland and a gift of the heart-lung machine to St. Barnabas Hospital.[2] Under such circumstances, the burden of proof was on the respondent. *Estate of Floyd Falese*, 58 T.C. 895, 899 (1972). At the conclusion of the trial, the Court ruled that respondent had not carried his burden and that consequently petitioner had donated the cataract machine to the University in

---

[2] Respondent concedes that the University and St. Barnabas are qualified charitable organizations. See sec. 170(c)(1) and (2). All references herein are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.

1967 and the heart-lung machine to St. Barnabas in 1969. We have carefully reviewed the record herein and find no reason to change that ruling. Our findings of fact reflect our adherence to our prior ruling.

The Court also ruled at the trial that the value of the stone donated to the Emanuel Episcopal Church in 1965 was $12,000. Here, too, we have carefully reviewed the record and, as our findings of fact show, we have concluded that we should adhere to that ruling. Accordingly, petitioner is entitled to a deduction in that amount for the taxable year 1965 plus out-of-pocket expenses related to the making of that donation in the amount of $2,525.51.[3]

The testimony of several witnesses and the nature of his achievements demonstrate that petitioner is an extraordinarily gifted and dedicated engineer.[4] There is no doubt that, in designing, building, and giving away the two pieces of equipment, he has made a significant contribution to medical knowledge. Our function, however, is to make a determination within a narrower frame of reference, namely, the "fair market value" of the contributed property.

As a threshold question to that determination, we will dispose of respondent's contention that, beyond his out-of-pocket expenses, petitioner's contributions consisted only of services for which, according to respondent's regulations (see sec. 1.170-2(a)(2), Income Tax Regs.), a deduction is not allowable. Compare *John R. Holmes*, 57 T.C. 430 (1971). Whatever may be the merit of respondent's contention in another context (see Rudick & Gray, "Bounty Twice Blessed: Tax Consequences of Gifts of Property or in Trust for Charity," 16 Tax L. Rev. 273, 287 (1961)), we think it has no application in this case. We are satisfied that, although there may have been an understanding that the tangible fruits of petitioner's efforts would be given to the charitable donees, neither of such donees at any time had any kind of enforceable rights in respect thereof. Cf. *John R. Holmes*, 57 T.C. at 437 n.6. Compare *Roland Chilton*, 40 T.C. 552 (1963). We think it clear that the services which petitioner performed coalesced in the resultant property interests. Cf. *William H. Mauldin*, 60 T.C. 749 (1973); *Bernard Goss*, 59 T.C. 594 (1973);

---

[3] Respondent concedes that the out-of-pocket expenses are allowable as a deduction in addition to the value of the stone. Petitioners' and respondent's experts testified that the stone was worth $26,334 and $8,468, respectively.

[4] Petitioner described himself as a "mad scientist."

*John R. Holmes, supra,* and cases collected therein at 57 T.C. 437 n.5.[5] As our subsequent analysis will show, however (see pp. 957-958 *infra*), a substantial portion of such services should not be taken into account in determining the amount of the contributions which petitioner is entitled to deduct.

The value of a charitable contribution is a question of fact. *Maurice Jarre,* 64 T.C. 183 (1975). The legal standard defining fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." See *William H. Mauldin,* 60 T.C. at 758; sec. 1.170-1(c)(1), Income Tax Regs. That standard is singularly unhelpful here. Indeed, the parties themselves recognized this in that they produced no evidence of "fair market value" as articulated by the foregoing definition. Nevertheless, we recognize that "absence of market price is no barrier to valuation."[6] See *Guggenheim v. Rasquin,* 312 U.S. 254, 258 (1941). Nor does uniqueness constitute a barrier. See *Publicker v. Commissioner,* 206 F. 2d 250, 253 (3d Cir. 1953). Indeed, the use to which donated property will be put is an element in determining value. See *Guggenheim v. Rasquin,* 312 U.S. at 257. This would appear especially to be the case where medical research equipment is involved. Cost has been accepted as an element of value (see *Guggenheim v. Rasquin,* 312 U.S. at 258; *Publicker v. Commissioner,* 206 F. 2d at 254), including cost of reproduction. See *Clinton Cotton Mills v. Commissioner,* 78 F. 2d 292, 295 (4th Cir. 1935), reversing and remanding 28 B.T.A. 1312 (1933). In short, "All relevant facts and elements of value * * * shall be considered." See sec. 25.2512-1, Gift Tax Regs.; *Publicker v. Commissioner,* 206 F. 2d at 254.[7]

Preliminary to our analysis of the evidence as to value, we address ourselves to petitioners' contention that, since they produced testimony of two experts and respondent produced none, they have made a prima facie case in respect of the value of

---

[5] See also *Robert H. Orchard,* T.C. Memo. 1975-31. Compare also *Maurice Jarre,* 64 T.C. 183 (1975). We also reject, as without merit, respondent's attempt to limit the "coalescence cases" to those donors who are engaged in a trade or business of producing the donated property.

[6] Nor is the presence of a limited market. *Publicker v. Commissioner,* 206 F. 2d 250, 254 (3d Cir. 1953); *Maurice Jarre, supra; Estate of David Smith,* 57 T.C. 650 (1972), affd. 510 F. 2d 479 (2d Cir. 1975); *Brandon Barringer,* T.C. Memo. 1972-234.

[7] We recognize that sec. 1.170-1(c), Income Tax Regs., does not contain this language, but it is obviously implicit in the definition of fair market value.

the two machines, which respondent has not rebutted, and consequently are entitled to a decision in their favor. We reject this position. Clearly, we are not required to accept expert opinion testimony as gospel. See *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U.S. 290, 298-300 (1934); *Williams' Estate v. Commissioner,* 256 F. 2d 217, 219 (9th Cir. 1958); *Clinton Cotton Mills v. Commissioner, supra; Wyoming Investment Co. v. Commissioner,* 70 F. 2d 191, 193 (10th Cir. 1934), remanding on other grounds a Memorandum Opinion of the Board of Tax Appeals; *Gloyd v. Commissioner,* 63 F. 2d 649, 650 (8th Cir. 1933); *Keystone Wood Products Co.,* 19 B.T.A. 1116, 1121 (1930), affd. 66 F. 2d 258 (2d Cir. 1933).[8] We are entitled to evaluate their testimony in light of the entire record and use our own judgment. This is precisely what we will now do and, as our analysis will reveal, serious doubts exist as to the efficacy of the expert testimony herein.

All of petitioners' experts provided 6-figure estimates of value; but, in each case, the valuation was based largely on the estimated cost of researching and developing machines, like the ones donated and bringing them to market. Put another way, they estimated the cost of retracing petitioner's steps to produce the machines. Petitioners then sought to corroborate the testimony of their experts by evidence of the time and effort spent by Mr. Cupler and a monetary evaluation thereof in developing the donated machines. There are several gaps in this approach.

First, adopting such an approach would require us to conclude that petitioner actually donated all he acquired by the development process to which those costs are ascribed. There is testimony that the market values of medical inventions depend largely on development cost; but the "invention" which can be sold for a figure adequate to recoup that *entire* cost has both tangible and intangible elements. The most valuable features of an invention are the rights acquired by the inventor—usually embodied in a patent—to control the use of the knowledge he has produced. A single instance of that invention, such as the prototypes developed by petitioner, may derive its value from those

---

[8] *Charles J. Kuderna,* T.C. Memo. 1965-143, relied upon by petitioners, is not in point. While we stated that, under circumstances comparable to those herein, the taxpayer had established a prima facie case through his expert witnesses, our decision was based on the conclusion that the fair market value of the property had been "established to our satisfaction."

intangibles but ordinarily will be worth less than they are. Although petitioner has applied for a patent on the cataract machine,[9] his testimony shows that his main purposes were two: to solve challenging technical problems and to contribute to the advance of medical science. Such a contribution, while laudable, is not the sort for which Congress has seen fit to allow a charitable deduction; section 170 applies only to gifts made in *property* to qualified organizations.[10] The record simply does not support petitioners' argument that all of the rights in the inventions represented by the machines were vested in the donees. At most, the record indicates what petitioner intended to do in the future; there is no evidence of any present transfer of such rights by way of an assignment or otherwise. Compare *Roland Chilton, supra.* Even if this intention could somehow be enforced by the donee, it does not satisfy the statutory requirement that payment be made "within the taxable year." Sec. 170(a). See *Lewis C. Christensen,* 40 T.C. 563, 574 (1963). Furthermore, the failure to take steps at the time to patent the rights in the inventions casts considerable doubt on the relevance of petitioners' evidence as to the value of the physical equipment actually contributed. Even a patentable invention is of considerably diminished value without the legal protection which a patent affords the inventor's rights. *Wagner v. Commissioner,* 63 F. 2d 859 (9th Cir. 1933).

Second, we note that, in respect of both machines, petitioner spent a considerable amount of time preparing himself by way of background study and in a trial-and-error process of development. Clearly, such elements should not be included in determining the value of the machines themselves. Preliminary sketches or discarded paintings do not affect the value of the painting finally produced by an artist; nor do earlier rewritten materials become part of the value of the final manuscript of an author.[11] In light of the foregoing, we think that much, if not all, of the value in the appraisals of the experts relating to the preprototype and development of prototype stages should not be taken into account.

Third, there is a question as to the value placed by petitioner on his own time. The number of hours spent in developing the machines is based upon pure estimates and constitutes, even if

---

[9] No patent has been applied for in respect of the heart-lung machine.

[10] See *William Fox,* T.C. Memo. 1965-195.

[11] Indeed, such sketches and rewritten material may have an independent value.

petitioner's prodigious capacity to work is taken into account, a large portion of his time in light of the fact that he was heavily engaged as a business executive. Moreover, the $500-per-day value placed on petitioner's time is dubious. Cf. *Bernard Goss,* 59 T.C. at 597. Petitioner testified that this was what he asked for as compensation as a consultant when he was away from the plant; in respect of the machines involved herein, he did much of his work at the plant and at his nearby home.[12]

. Fourth, the testimony of both of petitioners' experts was based almost entirely upon reproduction costs; we do not consider their general statements that a prospective purchaser would pay the equivalent of such cost to acquire the machines in and of itself determinative of value. Moreover, it is of some significance that one of petitioners' experts never saw the machines for which he furnished appraisals.

Fifth, in respect of the cataract machine, we have evidence of the price at which the comparable Douvas machine sold in later years. Petitioners' own witness, Dr. Schocket, testified that the two machines were "quite similar." It is true that petitioner's invention preceded the appearance of the Douvas device by a few years, but that does not mean that we should ignore such evidence. See *Estate of David Smith,* 57 T.C. 650, 659 n. 8 (1972), affd. 510 F. 2d 479 (2d Cir. 1975). While petitioner stresses the alleged technical superiority of his invention, Dr. Schocket was unable to say it was better than Douvas'. The Douvas machine has achieved widespread clinical use, while petitioner's has been applied to its intended purpose for the most part only in research. Moreover, it appears that the amount spent in developing the Douvas machine is comparable to the hypothetical cost derived by petitioners' experts. Further, we note that there were many difficulties attendant on the use of the machine at the time of the donation and that neither the tricep tool, an important part of the machine, nor the millisecond timers were included.[13]

There is less concrete evidence of value regarding the heart-lung machine. It was suitable only for use in Dr. Zimmerman's research on chick embryos; no comparable device existed and no

[12] The $500-per-day value is to be contrasted with the testimony of one expert that a full-time director of a project to produce a heart-lung machine would be paid $36,350 a year, and that the time of other personnel would cost $32 per day.

[13] The evidence merely shows that the tricep tool was delivered to petitioner's patent attorney in 1967.

one else was engaged in similar research. The fact that Dr. Zimmerman solicited the development of, and was satisfied with, the machine is evidence of value. *Maurice Jarre, supra; William H. Mauldin, supra; Estate of David Smith, supra.* [14] Furthermore, the heart-lung machine was considerably more complex than the cataract machine and required correspondingly more effort (and hypothetical cost) to produce. We also find it significant that this machine was by far the more successful of the two in terms of application to its intended use.

Based upon the foregoing considerations, as well as our evaluation of the testimony and the record as a whole, we have concluded, as our ultimate findings of fact show, that the fair market value of the cataract machine at the time it was donated to the University of Maryland Hospital in 1967 was $10,000 and of the heart-lung machine at the time it was donated to St. Barnabas Hospital in 1969 was $15,000, both amounts inclusive of petitioner's out-of-pocket expenses.

*Decision will be entered under Rule 155.*

---

[14] See also *Brandon Barringer, supra.*