WILLIAM THORNTON AND BARBARA THORNTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thornton v. Commissioner
Docket No. 3877-86
United States Tax Court
T.C. Memo 1988-479; 1988 Tax Ct. Memo LEXIS 508; 56 T.C.M. (CCH) 395; T.C.M. (RIA) 88479; October 3, 1988
Roland K. Martin, Jr., for the petitioners. Karen M. Quesnel and Thomas E. Crowe, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1976 through 1980 in the following amounts: Year
Deficiency
1976
$  21,295.00
1977
37,631.00
1978
198,945.00
1979
4,070.00
1980
135,043.20
After *509 concessions, including a stipulation at trial by respondent that for each year in dispute this disallowance of a deduction by petitioners for progressive slot accruals was incorrect, the issues remaining for decision are (1) what is the amount of charitable deductions petitioner William Thornton is entitled to as a result of donating the property known as Hillside Cemetery to the University of Nevada-Reno (UNR) and (2) what is the amount if any of taxable income realized by William Thornton upon his acquisition of Hillside Cemetery? FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits associated therewith are incorporated herein by reference. Petitioners, William Thornton (who is hereinafter referred to as petitioner in the singular) and Barbara Thornton, husband and wife, resided in Reno, Nevada when they filed their petition herein and when they filed joint income tax returns for 1976 through 1980 with the Internal Revenue Service Center at Ogden, Utah. Petitioner is licensed to practice law in Nevada, but for the years under consideration his practice was apparently limited because he reported a loss of $ 1,117 *510 on receipts of $ 699 in 1976, a loss of $ 14,623 on receipts of $ 11,546 in 1977, a loss of $ 47,005 on receipts of $ 10,885 in 1978, a loss of $ 64,572 on receipts of $ 2,143 in 1979, and a loss of $ 110,723 on receipts of $ 6,190 in 1980. However, for the same years, 1976 through 1980, petitioner reported a substantial salary ($ 118,008 for each of the years 1976 through 1979 and $ 201,340 for 1980) from Sierra Development Co., DBA Club Cal-Neva, a well-known Reno casino. Petitioners also jointly reported an average of over $ 1 million per year in dividends from the casino and Mrs. Thornton reported an annual salary as a professor at UNR of about $ 15,000. Hillside Cemetery is the oldest cemetery in Reno. It does not adjoin but is near property owned by UNR and some of the fraternities at the university. It is also near many of Reno's downtown casinos. The following brief history of Hillside Cemetery is believed to be needed for an understanding of the problem confronted herein. From the record as a whole and particularly from the report of Lawrence D. Camp, an expert witness for respondent, it appears that Hillside Cemetery was originally founded in 1875 when the State *511 of Nevada granted a patent to Wiltshire (also spelled Willshird) Sanders (also spelled Saunders) covering 40 acres of land located in Washoe County. In 1879 Mr. Sanders had a map of the cemetery prepared and recorded in Washoe County on May 27, 1882. On the same date Mr. Sanders conveyed part of the cementery to Amity Lodge, Knights of Pythias, Corporation (Knights of Pythias Cemetery) and on June 17, 1890 he conveyed lots 330 to 347 inclusive to General O. M. Mitchell Post No. 69, Grand Army of the Republic (G.A.R. Cemetary). Thereafter various other portions of the cemetery were conveyed out by Mr. Sanders and diverted at different times to other uses such as for some streets in the City of Reno after it was subsequently organized and also for private purposes. As a result of such conveyances the original cemetery was reduced by Mr. Sanders to 7.74 acres from which he conveyed burial lots to various purchasers using deeds containing a restriction to the effect that the conveyance of each lot was "for use as a burial lot, and subject to and upon condition that same shall be used by the [purchaser], his heirs, and assigns for no other purpose." In 1905, title to the cemetery, *512 excluding burial lots previously deeded out, was conveyed by Wiltshire Sanders to his wife, Margaret Sanders, who apparently continued to deed out burial lots with deeds containing similar restrictions until 1920 when further sales from the cemetery were prohibited by Ordinance #275 which was adopted by the City of Reno on June 14, 1920 and which became effective on January 1, 1921. After that date burials in the cemetery were limited to lots in which burials had already been made and to members of the families of the owners of such lots. The first recorded burial in the cemetery occurred on May 10, 1877. The last burial before the property was donated by petitioner to UNR on December 22, 1978 occurred on October 18, 1974 which brought the total interments in the cemetery to 1,434. Margaret Sanders died intestate in 1944 and title to the remainder of the cemetery descended to her sons, Robert W. Saunders and John O. Saunders, but prior to the death of Margaret Sanders and in or about 1930 she and both of her sons had moved away from the Reno area and abandoned the cemetery. As a result the property deteriorated from vandalism and the dumping of garbage and trash including wrecked *513 automobiles. Many of the older wooden grave markers were stolen and several large headstones were defaced or toppled. Part of the cemetery was also used as a parking lot by members of a nearby fraternity at UNR. The unchecked growth of weeds and brush in the cemetery became both a fire and health hazard and by 1970 the cemetery had become an eyesore to the city. Being unable to locate the owners of the cemetery the city began in about 1972 or 1973 to try to gain title to the property so that it could be cleaned up and at least part of it turned into a park or sold. At that time the actual cemetery consisted of two tracts, Parcel A and Parcel B. Parcel A containing 1.56 acres was bounded on the east by the G.A.R. Cemetery, on the north by Summit Avenue, on the west by the Knights of Pythias Cemetery, and on the south by West Ninth Street. Parcel B containing 5.16 acres was bounded on the east by Sycamore Avenue, on the north by West Ninth Street, on the west by Nevada Street and on the south by Evergreen Avenue. In addition to the actual cemetery which consisted of Parcels A and B the property included two other small tracts. One lay to the east of the G.A.R. Cemetery, contained *514 only 0.29 acres, and had at one time comprised a portion of Sycamore Avenue. The other small tract lay to the north of Parcel A and the Knights of Pythias Cemetery and contained 0.74 acres. This tract had at one time constituted part of Summit Avenue. Cemeteries located in the State of Nevada are governed generally by Chapter 40, sections 452.001 through 452.610 of the Nevada Revised Statutes (1986). The removal of bodies from cemeteries located in incorporated cities is covered by sections 451.069 to 451.340 of the same chapter. Most of the provisions which are applicable to removal of bodies were enacted by the Nevada legislature in 1961 as Senate Bill 222, which was sponsored by the City of Reno and UNR in order to authorize the disinterment of the St. Thomas Cemetery so that the underlying land could be acquired by Reno and sold to UNR for use in the construction of student housing. At that time the St. Thomas Cemetery was similar in size, age and deterioration to Hillside Cemetery. With regard to the removal of bodies from a cemetery located within a city in Nevada the 1961 legislation contained the following major provisions: 1. All disinterested bodies were to be *515 moved to cemeteries outside the city limits. 2. If a cemetery authority were to perform the disinterment, a minimum waiting period of 10 months was necessary from the first publication of public notice that remains were to be removed to the time that remains still in the cemetery could be removed. 3. In addition to the publication of notice in a public newspaper, the cemetery authority was required to mail a copy of the notice to owners of the lots within the cemetery as well as heirs of persons buried in the cemetery. 4. After removal of remains those portions of the cemetery from which remains had been removed and those areas where there were no interments could be sold, mortgaged or otherwise encumbered. 5. The cemetery authority was authorized to remove and dispose of appurtenant improvements such as monuments, headstones, and coping around the graves if they remained more than 90 days beyond the removal of the last remains from the cemetery. The cemetery authority had no liability in connection with the removal of these improvements if the proper time periods were observed. Although the disinterment from the St. Thomas Cemetery was apparently handled under the *516 1961 legislation without any major problem other than the public protests hereinafter described the City of Reno decided to seek special legislation in 1973 with respect to the Hillside Cemetery; and at the insistence of the city, the Nevada Legislature enacted Bill 942 in April of 1973. The pertinent portions of that Bill are as follows: SECTION 1. The legislature hereby determines, finds and declares that: 1. There exists in the City of Reno, Nevada (hereinafter sometimes referred to as "the City"), a cemetery known to and recognized by the public as the Hillside Cemetery, consisting of the two following described parcels of real property: (a) A parcel (hereinafter referred to as Parcel A) containing approximately 1.56 acres bounded by the Knights of Pythias Cemetery on the east, and West Tenth Street on the south. (b) A parcel (hereinafter referred to as Parcel B) containing approximately 5.56 acres bounded on the north by West Tenth Street, on the east by University Terrace, and on the west by Nevada Street. 2. Many years ago an individual who then owned Parcels A and B established therein the Hillside Cemetery and conducted the same as a business by selling burial *517 lots at a price fixed by him and conveyed the same to purchasers by written instruments. 3. No cemetery association, corporation or other authority exists or has ever existed for the purpose of monuments and tombstones placed thereon and any improvements thereto. 4. Because of the lack of proper supervision of Parcel B there has been a failure to preserve and keep it properly as a resting place for the dead. Graves have worn away, and there has, from time to time, been spoliation and desecration of the burial area, monuments and tombstones. * * * 6. Conditions have changed by the growth of the City since the establishment of Hillside Cemetery. The land comprising Parcel B is no longer suitable for the use to which it was dedicated and on account of the surrounding circumstances the discontinuance of such use is hereby required by the legislature in the promotion of the public health and welfare. * * * SEC. 2. After the effective date of this act any interment or reinterment in Parcel B is prohibited. SEC. 3. Within 3 years after the effective date of this act and after notice and public hearing as provided in section 4 of this act the City at its own expense *518 shall: 1. Disinter all human remains buried in Parcel B and reinter the same in Parcel A. 2. Relocate existing gravestones and monuments in Parcel B from Parcel B to Parcel A and install the same in flat positions over the new burial lots. 3. Fence, landscape and put Parcel A in a condition compaable to the adjacent Knights of Pythias Cemetery. 4. Install an appropriate monument or plaque in Parcel A containing a legend perpetuating the memory of the pioneers of the Truckoe Meadows and the City interred in such parcel. 5. Prepare a plat or map of Parcel A containing names, locations and other information, revising the same from time to time as required by new interments, and make copies of the same available to interested persons. SEC. 4. 1. Notice of a declaration on intention of the City to remove the human remains from Parcel B and a public hearing thereon by the city council shall be given by publication in a newspaper of general circulation published in the City. Publications shall be at least once a week for 4 successive weeks. 2. Copies of the notice shall, within 10 days after the first publication, be posted in at least three conspicuous places in *519 Parcel B. 3. A copy of the notice shall be mailed by regular mail to every person who owns, holds or had the right of interment in, prior to the enactment of this act, any plot in Parcel B, whose name appears upon the real property assessment roll of Washoe County. The notice shall be addressed to the last-known post office address of the plot owner as it appears from the records of the county assessor of Washoe County, and if his address does not appear or is not known, then to him in the City of Reno, Nevada. 4. The notice shall also be mailed to each known living heir at law of any person whose remains are interred in Parcel B, if his address is known. SEC. 5. 1. The county assessor of Washoe County shall forthwith, pursuant to law, assess and continue to assess (unless otherwise contrary to law) all property included in Parcel B. He shall assess and include in the tax list and assessment roll all taxes levied by authority of law for county purposes. 2. The City is specifically authorized to acquire the interest of every peson who owns, holds or had the right of interment prior to the enactment of this act in any plot in Parcel B or his living heir at law. *520 * * * 4. When the City has obtained ownership rights or title to all property included in Parcel B the city council shall, by competitive bidding, sell such rights and title. Any moneys derived from such sale shall be expended only by the City for perpetual endowment care of Parcel A, or may be placed to the credit of the general fund of the City to be expended only for city park and recreation purposes if the city council by resolution or ordinance first places Parcel A under the jurisdiction of the city park department or other appropriate city department or officer for continuing maintenance. * * * SEC. 7. This act shall become effective upon passage and approval. At about this time (1972) petitioner became interested in the Hillside Cemetery as a possible development site for apartments, fraternity houses, or domitories and launched a search for Margaret Sanders, and her sons, Robert W. Saunders and John O. Saunders, or their survivors. By June of 1973 petitioner had learned that Margaret Sanders was deceased and that Robert W. Saunders was deceased but was survived by his wife, Amelia Saunders, and one daughter, Margaret Saunders Deal. He also had learned that *521 John O. Saunders was deceased but was survived by his wife, Esther A. Saunders, and one son, Kenneth W. Saunders. After learning the above, petitioner approached Kenneth W. Saunders with a handwritten proposition as follows: I propose to enter into a partnership with such of the Saunders heirs who are living and who may have an interest in the property. This would be a 50%-50% partnership with me holding 50% and the Saunders heirs holding 50%. The goals would be as follows: 1) To establish an interest in the title to the property in the Saunders heirs. 2) Once title is established to place the property on the market for sale or lease on the best possible basis at the highest obtainable price. For may part I will do the following: 1) Do all legal work required at no cost for professional services to the partnership. 2) Advance all sums of money which may be required to achieve the goals of the partnership such as legal ''costs'', taxes, insurance, engineering, etc. These costs would be on a reimburseable, "loan" basis to be repaid only out of partnership assets (if any are realized) and deducted from partnership profits (if any) before the 50-50 split of profits *522 is made. (Together with interest at 7% per annum.) If no profits are realized then I will stand 100% of the loss of any moneys so advance. 3) Set up and maintain a separate set of financial books and records for the partnership which would be available for inspection by any partner. 4) Be the managing partner with authority to decide what legal steps to take and what moneys to expend. For the part of the other partners they will do the following: 1) Assist in locating and establishing the lawful heirs who may have a legitimate claim in the Hillside Cemetery property. 2) Execute such deeds or other documents as will establish a one-half interest in the property in William C. Thornton. 3) Lend their efforts to and execute such other documents as may be useful in order to accomplish the goals set forth above. Petitioner and Kenneth W. Saunders entered into the above preliminary agreement on June 25, 1973. However, on July 17, 1973 the preliminary agreement was superseded by a formal agreement drafted by petitioner which reads in pertinent part as follows: THIS AGREEMENT, * * * is made and entered into by and between KENNETH WILTSHIRE SAUNDERS, client, and WILLIAM *523 C. THORNTON, * * * attorney. WHEREAS, the client may have a right to certain real property located in the City of Reno, Nevada, or a claim against the City of Reno or others concerning said property generally in the area of the Hillside Cemetery * * * * * * WHEREAS, client desires to enforce said rights and claims by all appropriate means and against all proper persons and has this day retained William C. Thornton for such purpose, NOW, THEREFORE, for and in consideration of the promises herein recited and other good and valuable consideration the parties hereto agree as follows: 1. That the attorney is empowered and agrees to enforce said rights and claims on behalf and in the name of the client and to perform all the services, as attorney, necessary or appropriate thereto whether by instituting and maintaining to completion an action or actions or other legal proceedings, or otherwise, and by doing all things which are in his judgment necessary in order to perfect client's interests. 2. As compensation for said services by said attorney, the client will pay to him Fifty percent (50%) of any money or property paid, received, or collected, by action, compromise or otherwise, *524 upon or in satisfaction or settlement of said claims or any judgment of said claims or any judgment obtained thereon; and it is agreed that this contract is and shall operate as an assignment pro tanto to said attorney of said claims and rights, insofar as that is lawful, and of anything received or collected thereon and of any judgment or judgments obtained thereon. It is understood that, in the event there is no recovery on the rights and claims of the client, then client shall not be obligated to the attorney. The attorney shall advance the required expenses as a convenience to the parties. Any costs or expenses which are advanced by the attorney shall be repaid to the attorney out of the proceeds recovered, if any, together with interest thereon at the rate of Seven percent (7%) per annum prior to the division of any proceeds. That is, the Fifty percent-Fifty-percent (50%-50%) split after repayment to the attorney for any sums advanced, together with interest thereon. Attorney shall keep an adequate set of records regarding any sums advance. Insofar as it may lawfully be made such, this contract shall be irrevocable. The unwarranted discharge or attempted discharge *525 of the attorney or sale, transfer, assignment or encumbrance of the client's rights or claims shall not affect or destroy the attorney's rights and interest in said property and claims or the proceeds thereof or any judgment thereon, whether resulting from his services or otherwise. The attorney agrees to hold harmless the client from any liability which arises in connection with the pressing of the client's claims. The client may terminate the attorney (but not this agreement) if attorney does not diligently pursue this matter. * * * At or about the same time petitioner entered into an identical formal agreement with Margaret Saunders Deal. Petitioner then obtained a deed from Amelia Saunders which conveyed her interest in the cemetery to her daughter Margaret Saunders Deal and a similar deed from Esther Saunders which conveyed her interest in the cemetery to her son Kenneth W. Saunders. After these deeds were recorded petitioner persuaded Washoe County to convey its interest in the cemetery property to Kenneth W. Saunders and Margaret Saunders Deal upon the payment by them of the delinquent and unpaid taxes which had been assessed against the property by the county for *526 each year beginning in 1967. Such action was necessary because title to the property had technically vested in the County Treasurer due to nonpayment of the delinquent taxes. At approximately the same time petitioner as attorney for Kenneth W. Saunders and Margaret Saunders Deal successfully defended a claim of adverse possession which was made against the property by certain third parties and obtained a judgment in the District Court for the County of Washoe to the effect that ''Kenneth Wiltshire Saunders and Margaret Saunders Deal are the legal owners of the entire property known as Hillside Cemetery, including Summit Avenue, by virtue of inheritance and by deed, subject to the rights of ingress and egress by grave plot owners." Even though title to the cemetery property was held at that point by petitioner's clients Kenneth W. Saunders and Margaret Saunders Deal it was not possible to develop the property as envisioned by petitioner inasmuch as it was still designated a cemetery; and as a cemetery it was practically worthless because of its location, condition, and the fact that no new lots could be sold. Furthermore, development of the property as something other than a cemetery *527 was dependent upon the disinterment of the bodies buried there and their reinterment in some other cemetery. Under the applicable Nevada statute only the City of Reno could order the disinterment and to do so the city would have to formally declare after public notice and hearings that the continued maintenance of the cemetery was "not in accordance with the health, safety, comfort or welfare of the public." The statute also required that any disinterred bodies would have to be reinterred outside the city and could not be moved to a different place within the same cemetery. In an attempt to remedy this undesirable situation petitioner in April of 1975 lobbied the Nevada Legislature which meets only in odd years with a view to amending the applicable Nevada statutes. The attempt failed however and the desired legislation died in committee. On November 23, 1976, petitioner offered to purchase the interest of Deal and Saunders in the property for $ 7,500 each. In connection with the offer, petitioner told Deal and Saunders that it would take "considerable sums of money" to do anything with the property and that he had already expended about $ 15,000 with regard to it ($ 10,000 *528 in legal fees, $ 3,322.06 in other expenses, and $ 380 in taxes). Petitioner also told them that, in his opinion, the property might be worth $ 30,000 but the county tax assessor had valued the property at only $ 16,100. In March of 1977, petitioner relayed to Deal and Saunders an offer by a third party to purchase 6,000 square feet of the property for $ 3,000 but advised them to reject the offer. At this time he renewed his offer to buy their interest for $ 7,500 each. Deal and Saunders were unable or unwilling to invest any money in the property; and as far as they were concerned, anything they received from the property was a windfall since they had not been aware that they had any interest in it until they were contacted by petitioner. To them petitioner's offer appeared to be fair. In May of 1977 petitioner entered into a contract with Saunders in which they mutually agreed to cancel their agreement of July 17, 1973 and Saunders agreed to sell his interest in the property for $ 7,500 and petitioner agreed to purchase it provided he was able to obtain Deal's interest for a similar amount. On July 18, 1977 Saunders conveyed his interest in the property to petitioner and *529 Deal conveyed her interest to him on August 2, 1977. They were each paid $ 7,500 by petitioner. Saunders represented himself throughout his negotiations with petitioner. Deal had her own attorney although petitioner frequently contacted and consulted with her directly even though he knew she had separate counsel. In 1978, petitioner hired Clinton Wooster to lobby the Nevada legislature for a bill that would permit the owner of a cemetery to disinter old gravesites and reinter the remains in a separate part of the same cemetery. Mr. Wooster had been a state legislator, state legislative counsel and Reno city attorney as well as lobbyist before the state legislature for several different groups and organizations. He drafted proposed revisions to the applicable state statutes which were acceptable to petitioner inasmuch as they defined "cemetery authority" very broadly and with respect to cemeteries located within a city permitted the removal and reinterment of bodies within the same cemetery or to another cemetery within the same city. Since the Nevada legislature meets only in odd years Mr. Wooster was unable to present his revisions to the legislature until 1979. By a *530 quitclaim deed dated December 22, 1978 peititioners conveyed their interest in Hillside Cemetery to UNR. On February 23, 1979 UNR requested and received the approval of its Board of Regents of an offer by William Thornton to continue his lobbying efforts and to provide those of Mr. Wooster as part of the gift. The property was zoned R-3 by the City of Reno. Such a zoning includes multiple residential development, as well as fraternity or sorority houses, and child-care centers. When it acquired title to the property UNR contemplated using any part of it which could be removed from the cemetery restrictions as a site for married student housing. The remedial legislation proposed by Mr. Wooster was introduced in the legislature as Senate Bill #527 on April 26, 1979. After public hearings it was adopted by the legislature and signed into law by the governor in May of 1979. During the public hearings some local residents and at least one legislator expressed concerns about the disinterment/reinterment process outlined in the bill. These concerns prompted UNR to make public certain assurances that UNR had given to the legislature with regards to the fencing of the reinterred graves, *531 relocation of existing tombstones, and the quality of the perpetual care which would be provided with respect to the graves. Similar resistance is expected at the city level if and when the city undertakes to adopt an activating ordinance. Until such an ordinance is passed, the graves cannot be disintered and the property is unavailable for any development or use other than as a respository for existing graves. Other major provisions of Senate Bill #527 are as follows: 1. Repeals the special legislation passed in 1973 on behalf of the City of Reno. 2. Permits reinterment of remains from one portion of a cemetery to another portion of the same cemetery or in another cemetery within the city limits. 3. Increases the requirements for notification of the proposed disinterment. 4. Requires that the city approve an ordinance prescribing regulations governing the disinterment and reinterment of remains. 5. Requires the approval of the District Court of Washoe County for removal of the cemetery dedication for all or any part of the cemetery from which bodies are removed. 6. Amends the definition of a cemetery authority to include persons or other entities who own cemetery *532 property although such owners do not operate a cemetery as a business. A cemetery authority was not defined in the prior statutes governing disinterment of graves but the definition in the general provisions governing cemeteries, N.R.S. sec. 452.008, limited a cemetery authority to an entity having ownership of cemetery property and which was engaged in the operation of a cemetery business. At a hearing on Senate Bill 527 which occurred on May 1, 1979, Mr. Wooster as special counsel for UNR stated that even with the adoption of the Bill it would take at least three years to clear all the legal hurdles to a relocation of the gravesites and before any development of the property for another purpose could begin. The minimum cost to disinter the 1,434 graves in Hillside Cemetery and consolidate them in a smaller section of the cemetery would be $ 150 per grave. This figure is based upon the assumption that reinterment could be done military style which means that the remains would be placed in common graves in stacks of up to seven in depth depending upon the nature and type of soil. The names of remains which can be identified would be noted on monuments or memorials at the common *533 gravesites. The monuments or memorials for common graves containing unidentified remains would have some appropriate designation such as "This grave contains the remains of persons originally buried in Hillside Cemetery." With the use of a military style reinterment the remains in the 1,434 original graves could be reinterred in seven-tenths of an acre, leaving approximately seven acres of Hillside Cemetery for other development. If a military style reinterment within Hillside Cemetery is not possible for all of the remains, the cost per grave of the relocation would increase and the area needed for reinterment would also increase and the area available for other development would decrease. Reinterment of the bodies outside the original cemetery would cause a substantial increase in the cost per grave. Cemeteries in Nevada are required to maintain a perpetual care or maintenance fund equal to at least one dollar per square foot of its graves. N.R.S., Sec. 452.120. One dollar per square foot, however, is barely enough to provide minimal care and the industry norm is approximately five dollars per square foot. UNR is publicly committed to maintain any graves which it relocates *534 in Hillside Cemetery as a "very high quality cemetery." Such maintenance would require substantially more than the minimum endowment required by the statute. As indicated earlier, at the time UNR acquired the property UNR contemplated that any part of it which could be removed from the cemetery restrictions would be used as a site for married student housing. The University's plans for the property have since changed. Due to lack of funding for disinterment/reinterment, the time already consumed in securing favorable legislation from the state legislature, the estimated time needed to obtain the necessary city ordinance and the approval of the District Court of Washoe County as well as the ill-will which may be generated in the community, the University has decided that the best and possibly the only use it could make of the property is to continue it as a cemetery or to sell it. This conclusion is based in part on problems which the University had in a somewhat similar situation with respect to the St. Thomas Cemetery. UNR acquired St. Thomas, a parish cemetery located in Reno, in 1962 and relocated approximately 1,500 bodies at a cost of about $ 150 per grave into a plot containing *535 four-tenths of an acre in Our Mother of Sorrows Cemetery which is also located in Reno. UNR acquired St. Thomas and relocated the bodies in order to convert the underlying land into a site for student housing. Title to all of the underlying land in St. Thomas and in Our Mother of Sorrows was held by the Roman Catholic bishop of Reno/Las Vegas and the holders of the burial lots had only the right of interment. Consequently title-wise this acquisition and relocation by UNR was relatively uncomplicated because only UNR and the bishop were involved. Nevertheless the widespread public outcry at the perceived insensitivity involved in the St. Thomas relocation in 1962 was still fresh in the minds of many local residents at the time of trial in 1987 even though at least some part of the public outcry with respect to St. Thomas was occasioned by the discovery that old headstones and monuments removed from St. Thomas were unceremoniously dumped in a gully. Unlike St. Thomas, the 1,434 occupied burial lots in Hillside Cemetery were purchased in fee simple by individuals between 1875 and 1920; and therefore, title to the land underlying these lots now rests in such purchasers, or in most *536 instances, in their unknown heirs. Despairing of ever getting enough money to properly develop the Hillside Cemetery, and mindful that its high profile in the community would make it difficult to relocate the graves under the best of circumstances, UNR entered into an option agreement with Sierra Memorial Services of Reno (Sierra) on September 4, 1985. The option agreement was fully negotiated by both parties and their attorneys and constitutes an arm's-length transaction. The agreement contains no restriction on the use to which the optionee might put the property if the option is exercised. Under the agreement Sierra has the option to purchase the cemetery for $ 150,000. The purchase price is payable as follows: $ 10,000 upon closing and the balance of $ 140,000 is payable without interest in annual installments of at least $ 10,000 until paid in full. The stated consideration for the option is the performance of certain tasks by the optionee. These tasks include (1) successful closure by negotiation or condemnation by the City of Reno of that part of property formerly known as Evergreen Avenue, (2) successful negotiation of a purchase of certain property to south of the *537 cemetery, (3) compilation in optionor's computer of historical data on persons buried in cemetery, (4) determination and marking of all boundaries of the property, and (5) an overall clean-up of the property during the option period including the removal of debris, weeds, and other materials. The option period was to expire under the agreement on December 31, 1987 which date was after the trial and the record does not reflect whether the option was exercised, lapsed, or extended. However, the parties agree that up to the date of trial, September 15, 1987, the property was still in the same deteriorated state it was in when it was quitclaimed by petitioners to UNR in 1978. On their income tax return for 1978 petitioners claimed a charitable deduction of $ 503,500 with respect to the gift of Hillside Cemetery to UNR. A portion of the deduction was carried over by petitioners to their 1979 and 1980 returns. In his deficiency notice respondent first determined that the fair market value of the cemetery at the time of the gift was only $ 15,000 and adjusted petitioners' allowable charitable deductions accordingly. In the alternative, respondent determined that if petitioners' appraisal *538 of $ 503,500 for the cemetery was found to be correct the appraisal should be adjusted downward to $ 159,000 for errors in the size of the property and the valuation date plus a time discount for the estimated delay in developing the property and the estimated cost of funding perpetual care for the reinterred graves. In an amendment to his answer respondent claimed an increase in petitioners' deficiencies for 1976 and 1977 for any interest William Thornton received in the property during those years as and for attorney fees or in the form of a bargain purchase from his clients, Saunders and Deal. OPINION The principal issue in this case is the amount of the charitable deductions which petitioners are entitled to with respect to William Thornton's donation of the Hillside Cemetery to UNR. The parties are in agreement that where as in this case a charitable contribution which is otherwise deductible under section 170 is made in property other than money the amount of the contribution is the fair market value of the property on the date of the donation. Section 1.170A-1(c)(1), Income Tax Regulations. *539 The parties are also in agreement that the fair market value of property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts. Section 1.170A-(1)(c)(2), Income Tax Regulations. Furthermore they are in agreement that the fair market value of property on any given date is a question of fact to be determined from all of the relevant evidence in the record. Jarre v. Commissioner,64 T.C. 183, 188 (1975); Kaplan v. Commissioner,43 T.C. 663, 665 (1965). On their return for 1978 petitioners claimed that the fair market value of Hillside Cemetery on the date it was contributed to UNR was $ 503,500. In his notice of deficiency respondent determined that the fair market value of the property on the date of its donation was only $ 15,000. In the alternative respondent also determined in his notice of deficiency that if petitioners' appraisal of $ 503,500 for the property is found to be correct such amount should be reduced to $ 159,000 for errors made in the appraisal in the size of the property and *540 the date of valuation plus a time discount for the estimated delay in developing the property and the estimated cost of funding perpetual care for the reinterred graves. In an amendment to his answer respondent determined that William Thornton received additional ordinary income in 1976 and 1977 either as attorney fees or in the form of a bargain purchase of an interest in the cemetery from his clients, Saunders and Deal. Respondent's determination in the deficiency notice that the fair market value of the donation was $ 15,000 is presumptively correct and petitioners have the burden of proof with respect to any value in excess of that amount. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Respondent has the burden of proof with respect to the additional income claimed in his amended answer. Rule 142(a). Petitioners recognize the well-settled principle that in determining a charitable deduction for property contributed to a qualifying institution the fair market value of the property has to be adjusted for any restriction *541 on its marketability on the date of the contribution. Cooley v. Commissioner,33 T.C. 223, 225 (1959), aff'd, per curiam 283 F.2d 945 (2d Cir. 1960) and Fargason v. Commissioner,21 B.T.A. 1032, 1037-1038 (1930). See also Deukmejian v. Commissioner,T.C. Memo. 1981-24; Fiske v. Commissioner,T.C. Memo. 1984-494; and Crock v. Commissioner,T.C. Memo. 1983-351. In recognition of this principle petitioners undertook to value the property involved in this case in the following manner. From all of the expert testimony in the case petitioners assumed that the highest and best use for the property was as a site for multiple unit housing. They then took the overall value of the property for such use as determined by their expert and reduced or discounted such value for such use by (1) the estimated cost of obtaining the necessary legislation to permit the property to be used as such a site, (2) the value of that portion of the property which would be needed in order to reinter the remains buried in the 1,434 graves in the cemetery at the date of the gift, (3) the cost of removing and reinterring *542 such remains, and (4) a time discount for the estimated delay which would be necessary in order to accomplish all of the above. Respondent contends that (1) under the circumstances existing at the time the donation was made petitioner's basic assumption that the property would ever be available for its highest and best use is to speculative to be valid, and (2) that even if such assumption is valid petitioners' valuation is incorrect in several respects. With respect to the overall value of the property petitioners rely upon the report and testimony at trial of William G. Kimmel who has been a resident of Reno for most of his life and has been employed as a real estate appraiser since 1961. He is a member of the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers. His previous experience includes the appraisal of cemeteries and some of his former appraisals have been made for respondent. In the preparation of his report, Mr. Kimmel was instructed by petitioners to assume that all legal hurdles to the disinterment and reinterment of the bodies in the cemetery had been cleared and that the property was available at least in part for other *543 uses. Consequently, Mr. Kimmel did not consider in his report the time and expense needed to secure the needed legislation from the state and city. He also made no adjustment for the statutorily required perpetual care fund for reinterred graves. On the other hand, Mr. Kimmel in his report considered only 5.5 acres as being available for development since he was unaware at that time that only seven tenths of an acre was needed for military style reinterment. At trial, Mr. Kimmel expanded upon his report with testimony that in his opinion the highest and best use of the property in view of its R-3 zoning was as a site for multiple unit housing and to establish a gross value for the part of the cemetery which would be available after reinterment of the remains in the 1,434 existing graves he found and used seven sales which he considered comparable. From these sales he concluded that as a site for its highest and best use the remainder of the cemetery after relocation of the existing graves had a gross value of $ 3.00 per square foot for a total of $ 718,740. From the gross value of $ 718,740 determined in the above manner, Mr. Kimmel first subtracted $ 215,100 as the cost of relocating *544 the 1,434 graves. This amount was obtained from the testimony of Lee Kent, another witness for petitioners, who has been in the business of disinterring and reinterring bodies in old cemeteries since 1946. Most of such work has been performed for the Corps of Engineers and other governmental agencies such as the Tennessee Valley Authority. Since 1946 he has been responsible for moving more than 100,000 bodies. He has also been consulted by the Corps of Engineers in the preparation of standards for governing the disinterment and reinterment of bodies. In his opinion the relocation of the bodies in Hillside Cemetery would cost $ 150 per grave provided all necessary state and city approval had been obtained, all of the remains were relocated in a part of Hillside Cemetery, and the reinterment could be done military military style. In his opinion a military reinterment could be done in seven tenths of an acre. In his trial testimony, Mr. Kimmel used 1.02 acres for the reinterment and calculated and deducted from the gross value a perpetual care fund at the statutory minimum of $ 1.00 per square foot or $ 44,434. He further deducted $ 5,000 for fencing and landscaping the reinterred *545 gravesites. Mr. Kimmel hesitated to estimate a cost as of the date of the gift for obtaining the state and local legislation needed to allow relocation of the graves. In fact, he admitted that any amount assigned to such legislation would be highly speculative. However, he did use a discount of between 10 and 15 percent for the local ordinance and for the estimated two year delay needed for the legislative process and relocation of the graves. His ultimate appraisal was $ 463,000 to $ 491,000 for that portion of the cemetery which would remain after relocation of the existing graves. At trial respondent relied upon the reports and testimony of Lawrence D. Camp and Stephen R. Johnson. Mr. Camp has been a professional forester since 1972. He has been employed by the respondent since 1984. He has never appraised a cemetery or any property in the Reno area including multiple residences. His appraisal experience has been limited primarily to timber and timberland. We are impressed, however, with the thoroughness of his report on this particular property. At first Mr. Camp reviewed the seven transactions used by Mr. Kimmel and concluded that they are comparable sales if the *546 subject property could be used for its highest and best use. He does not agree with the use of $ 3.00 per square foot by Mr. Kimmel when the highest price paid for any of the seven comparable sales was only $ 2.65 per square foot. Mr. Camp concluded, however, that only 5.9 acres would be available for development after relocation of the graves. He arrived at this erroneous figure by assuming that the remains removed from the existing gravesites would have to be reinterred in graves of equal size rather than in a much smaller area. By using $ 2.65 per square foot and 5.9 acres as being the amount available after relocation of existing graves Mr. Camp computed a gross value of $ 668,154.35. From his gross value, Mr. Camp deducted $ 23,000 for a perpetual maintenance fund using the established funds of the two adjacent cemeteries. Like Mr. Kimmel, he also accepted Mr. Kent's $ 215,100 estimate for disinterment/reinterment of the remains and then applied a discount of 11 3/4 percent (the prime rate in December 1978) for the two years estimated by Mr. Kimmel to be necessary to obtain the legislation and to carry out the disinterment/reinterment prior to development. By using the same *547 valuation method adopted by Mr. Kimmel with the above adjustments Mr. Camp thus arrived at an appraisal of $ 344,000. However, his ultimate conclusion was that Mr. Kimmel's method was unsatisfactory not only because of the speculative nature of the highest and best use assumed by Mr. Kimmel but also because an actual sale of a one-half interest in the subject property had occurred only 18 months before the valuation date. Since the condition of the property had not changed during the 18 months between the purchase by William Thornton of the one-half interest in the property for $ 15,000 Mr. Camp concluded that the fair market value of the property on the date of the gift did not exceed $ 30,000. Respondent's second expert, Stephen R. Johnson, is a lifelong resident of Reno and a member of both the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers. He has been appraising property including some cemeteries since 1970. Instead of making an independent appraisal of the subject property, Mr. Johnson submitted a critique of the appraisals of Mr. Kimmel and Mr. Camp. In his opinion, the method utilized by Mr. Kimmel involves entirely too much *548 speculation to produce in this case a reliable valuation of the property on the date of the gift. He concluded that the valuations arrived at by Mr. Kimmel, and by Mr. Camp using Mr. Kimmel's method, are extremely high because the assumption that the property could ever be used for its highest and best use was too speculative on the date of the contribution. Mr. Johnson agreed with Mr. Camp that the actual sale of an interest in the property was the best evidence of the property's value. We agree with petitioners that in determining the value of property on a given date a potential highest and best use for the property can be considered even though the potential use is prohibited on the valuation date by some restriction in a deed, statute or zoning regulation. Ebben v. Commissioner,T.C. Memo. 1983-200, affd. on this issue 783 F.2d 906, 910 (9th Cir. 1986). We also agree that in such a case the proper approach is to value the property at its highest and best use even though its highest and best use is prohibited at the date of valuation by the applicable *549 restriction then to proceed to reduce or discount such value by a reasonable estimate of the cost of removing the restriction and for the time needed to accomplish such removal. However, the projected highest and best use must have a strong possibility of achievement. In other words, it should not be remote, speculative or conjectural. See Olsen v. United States,292 U.S. 246, 257 (1934); McGovern v. New York,229 U.S. 363, 372 (1913). See also Crock v. Commissioner,T.C. Memo. 1983-351 and Fiske v. Commissioner,T.C. Memo. 1984-494. Under the circumstances surrounding Hillside Cemetery at the date of its donation to UNR in December 1978, we are forced to conclude that its potential availability for its highest and best use, i.e., as a site for multiple unit housing, it too remote, too speculative and too conjectural to permit such use to be considered in determining its value at that time. In view of such circumstances, as set forth in detail in our findings, it is apparent that on the date of the contribution Hillside Cemetery was far from being available for its highest and best use. Briefly stated before any *550 part of the cemetery could be devoted to such use the following had to be done: (1) The state legislation necessary to remove the restriction of the property to use as a cemetery had to drafted, submitted to the legislature, subjected to public hearings, passed by the legislature, and signed by the governor. (2) After enactment of the state legislation an ordinance outlining the procedure for removal of the 1,434 graves and the reinterment of their contents in military style had to be drafted, submitted after notice to all identifiable lot owners or their heirs to the city council of Reno, subjected to public hearings by the city council, and adopted. (3) After the city ordinance containing the proposed procedure for removal and reinterment of the remains in the 1,434 graves was adopted by the city council such procedure had to be submitted after similar public notice to and approved by the District Court of Washoe County. The District Court also had to formally remove the cemetery dedication from that portion of the property which was not needed for the relocation of the 1,434 graves. At each of the above steps interested residents of Reno and the surrounding area including *551 friends and relatives of the various parties buried in the cemetery including some founding fathers of the city of Reno would have an opportunity to appear and support or oppose the proposed procedure. It logically follows that an increase in opposition could be expected at each step in the procedure to closing part of the cemetery and to the proposed manner of relocating the remains especially where the proposed reinterment of such remains is to be done in military style. This is apparent from the fact that representatives of UNR readily admitted at trial that there was still public bitterness over UNR's acquisition of the St. Thomas Cemetery more than 25 years before. Moreover, in contrast to the speculation, remoteness and conjecture associated with the possible use of the property advocated by petitioners, we have in this case an actual sale in July and August of 1977 of a one-half interest in the subject property by Kenneth Saunders and Margaret Deal to William Thornton. Petitioners argue that such sale should not be considered because the circumstances surrounding the property had changed in the 16 months between the sale by Saunders and Deal and the contribution by Thornton *552 on December 22, 1978. Their argument, however, is not supported by the record. First the record contains no evidence that there was any appreciable change in the physical nature of the property during such period. Secondly, with respect to the removal of the restrictions on the use of the property, we have found that while some lobbying and drafting was done on the state legislation prior to that time the legislation ultimately adopted by the state was not introduced until April of 1979 and Mr. Thornton's offer to provide his services and those of Mr. Wooster with respect to the legislation was not made to or accepted by UNR until February of 1979. Furthermore, up to the date of trial in September 1987 no attempt had been made to obtain the necessary city ordinance or the approval of the District Court of Washoe County. Even though the sale of the one-half interest in the Hillside Cemetery was from Mr. Thornton's clients, Mr. Saunders and Mrs. Deal, to Mr. Thornton, we are certain that as a lawyer Mr. Thornton exercised due care in making known to his clients any and all facts in his possession which had a bearing on the value of the property on June 17, 1977. We conclude therefore *553 that the sale of the one-half interest was an arm's-length transaction and that the consideration of $ 15,000 represented the value of such interest on the date of the sale. We have found that in addition to the $ 15,000 which Mr. Thornton paid to Mr. Saunders and Mrs. Deal for their one-half interest in the property he also paid out the sum of $ 13,702.06 in attorney fees, taxes and other expenses in connection with his acquisition of the property. Therefore, from the record as a whole we conclude that the fair market value of Hillside Cemetery on June 17, 1977 was $ 28,702.06. Since the record contains no creditable evidence from which we can find that the value of the property changed between June 17, 1977 and December 22, 1978 we are satisfied and conclude that the fair market value of the property on the date of its donation to UNR was also $ 28,702.06. Inasmuch as Mr. Thornton paid an equal amount for the property, it is apparent that he realized no income upon its acquisition either as attorney fees or as a bargain purchase. In reaching the above conclusions we have considered but can give no weight to the option granted by UNR on September 4, 1985 to Sierra Memorial *554 Services to purchase the property for $ 150,000 because (1) the transaction is not a sale and (2) the record contains no evidence from which we can determine a value for the various tasks required of the optionee. It appears, however, that the value of such tasks may equal or even exceed the option price. To reflect the foregoing, as well as concessions made by the parties Decision will be entered under Rule 155.